(118 So. 330)

CHESTANG v. KIRK et al.   (I Div. 482.)

Supreme Court of Alabama.   Oct. 11, 1928.

Harry T. Smith & Caffey, of Mobile, for appellant.

Gordon, Edington & Leigh, of Mobile, for appellees.

THOMAS, J. The general affirmative charge was requested by the defendants and given by the court.

Affirmative instruction should not be given if there are adverse inferences that may be drawn from the evidence by the jury. McMillan v. Aiken, 205 Ala. 35, 40, 88 So. 135. And such is the rule if the scintilla of adverse evidence is developed by the cross-examination of any witness, thus presenting a jury question. Jones v. Bell, 201 Ala. 336, 77 So. 998. Such is the effect of the scintilla of evidence rule that obtains in this jurisdiction. Finney v. Long, 216 Ala. 628, 114 So. 200; Cleveland Laundry Mach. Co. v. Southern Steam Carpet Cleaning Co., 204 Ala. 297, 85 So. 535.

Defendants offered no evidence. There were reasonable tendencies of evidence offered by plaintiff that plaintiff purchased and had a conveyance to her of the lands from which the timber and wood, made the subject of the suit, was cut and removed; that she recorded her deed, and instructed her brother who lived at the lands to take charge and look after the property for her; that she assessed the property for taxes as being in ownership thereof; was asked, "Did you take possession of this property?" and answered, "Yes, sir;" that after she "had been in possession of this property," some one "cut some of the timber on the land" and "cut some cordwood" therefrom; that this was without her "knowledge, consent or permission"; that her "brother Michael Chestang was looking after the land" for her; that such agent lived at the old homestead at Cold Creek near by, and reported to her this depredation; that she had "been to the land since the wood and timber was cut," and Mr. C. M. Kirk (one of the defendants) came to see her in Mobile and said on his first visit that "he was willing to pay for the timber he had cut, he would either give me cash or a piece of the same section, and the second time he came he was very ugly; he said he wouldn't even as much——

"Defendants make a motion to exclude her statement that he was very ugly. 'On the occasion of Mr. Kirk's second visit to my home, he said he was going to cut all the timber off my land; that he had ten years to cut it. About the cordwood, he said he would pay for the cordwood. He first said that it was about 50 or 60 cords and then turned around and said that it wasn't that many cords.' "

Plaintiff further testified on cross-examination that said land was not well timbered, was not inclosed when she purchased it, and she did not inclose same or build any houses or structures thereon; that plaintiff "didn't

do anything on the land after" she purchased it. She said:

"I didn't have a chance to do anything on it. The only thing I did after I bought it was to pay taxes on it. That was all. That is the only act of ownership that I exercised over the land after I bought it. I paid taxes on it, and that is all I did. I paid $600 for the land. I have not been living in Mobile all the time since I bought the land. I was up home part of the time on account of my health. I was living in Mobile at the time I got the deed from the Creola Lumber Company."

Witness Weaver testified for plaintiff, in substance: That he knew where the old Chestang homestead was on the east side of that house (homestead house). That he was cutting timber for Donald Kirk (one of the defendants); was paid by the cord. He saw the timber being cut off said eighty in 1926 (the year in question). That he reported to Kirk "about the dispute out there with the Chestangs over the wood," and his reply was that "he had a right to the timber and wood and go ahead and cut it and not to pay any attention to the Chestangs. * * * He told me to say that I bought the wood from him and sold it to him." That such was not the fact—did not happen. That Donald Kirk "paid (me) him for cutting the wood." Witness further stated: That he "hauled it to the plant," and that Kirk told him "that. regardless of what the Chestangs said, to cut the wood and haul it off." That this "was his wood and his timber and he had a right to it and claimed to own it as his own, and not to pay any attention to the Chestangs." That they "had been cutting timber there before that," and did not "know how long before that." That he did not "cut there seriously, but off and on." He could not say "how long before." That it would go back "two or three years from that time."

That witness, being cross-examined, stated:

"I don't know of my own knowledge whether Mr. Kirk had any title to the timber which was cut. I never saw Mr. Kirk personally out there cutting trees. * * * The Kirks employed me. I cut some for them. I don't know whether Mr. Kirk was cutting it for Kirk or for the Creola Lumber Company. When I was out there in 1926 cutting this wood for Mr. Kirk and hauling it to the Kirk Brick & Lumber Company plant, there were lots of people working out there. There was Mack Loftin, Mr. Parnell was cutting trees out there. He was cutting logs."

Plaintiff's brother, Mike Chestang, testified that he lived at the old homestead that adjoined the lands in question on the west; that his sister purchased of said lumber company; that he knew the lines of that 80 acres, "was with the surveyor when he ran those lines," when Mr. Holly and Tommie McCarter were present; he remembers the time when his sister purchased—about a "year and a half" before the trial—and stated:

"I have been looking for '(meaning, we interpret, 'after') the land for her while she was in Mobile. I took no wood off of the land for my own use during that time. There were some people, Mr. Kirk's people, cutting timber or wood on that land and hauling it. I went out to protest against the cutting. I went out there and told one fellow, Mr. Kelly Edwards. He had a truck hauling the wood down to the brickyard. I came down to Mobile and reported the matter of the timber cutting to my sister Cecilia. The wood cutting and the timber cutting did not stop. It continued. I saw the cordwood which they cut and were hauling away from the land. I saw them hauling it that day. They couldn't have taken no less than 50 or 60 cords from the 80 acres of land, because it is clean now. They cut pine trees off the land. The size of the trees were 4 inches in diameter at the top up, and some of them were about 18 inches. It isn't any count now; it is clean. It is swamp and sand hills. * * *

"I live about 30 steps from this land. I have never taken any wood from it or anything of that sort since Cecilia Chestang bought it. Nobody has ever taken any from it for Cecilia since she bought it, and she has not had anything done herself. She just bought it and paid the taxes, and whatever timber was cut, that was cut by somebody else. This wood was all cut by the Kirks. I saw them cut it. * * *

"I went out there and tried to stop them when they were cutting. They did not stop, but kept cutting."

Counsel for the appellees treat the word "for" as "after" in the above testimony, and so quote it in their brief. This is its meaning in the context.

The witness Davis testified of the location of the Chestang homestead as to the lands in question. Stated he "saw evidence of the lines having recently been run"; that he counted the stumps, etc., and estimated the timber recently cut and removed therefrom; that the character of the land was white sand hill and a swamp, with no cultivatable land on that 80, and only the timber and wood on that land lent any value to it; that there was some timber left on one 40 "right adjoining the Chestang homestead," etc.

The plaintiff rested after offering evidence to the foregoing effect.

The "defendant rested," and requested the general affirmative charge which was given.

In the case of East Tenn., Virginia & Ga. Ry. Co. v. Davis, 91 Ala. 615, 621, 8 So. 349, 351, a case of statutory action in the nature of ejectment, Mr. Chief Justice Stone said:

A "witness may testify to material facts, either single or collective. * * * Witnesses were properly allowed to testify to ownership, to possession, and to permission given. * * * Nature, duration and character of possession, or, rather, the facts showing them, were competent evidence."

There was no objection or exclusion of the witness Cecilia Chestang's statement that, after she secured the deed, she filed it for record in the probate court in Mobile county,

assessed the land in her name for taxes, and took possession of the property; and the effect of Mike Chestang's evidence was that he was looking after the land for the owner while she was in Mobile.

■ Such evidence unrebutted made a prima facie case of possession and ownership to prevent the general charge on the theory that no possession had been shown by plaintiff.

■ Moreover, the offer of C. M. Kirk to pay for the timber and wood cut and removed from the land claimed by plaintiff was an admission against interest and of liability that carried the case to the jury. It was not an offer of compromise that prevented the same being given to the jury. Lisenby v. Capps, 200 Ala. 20, 75 So. 332; Alexander v. Smith, 180 Ala. 541, 555, 61 So. 68; L. & N. R. Co. v. John W. O'Neill Co., 204 Ala. 154, 85 So. 482; 6 Michie's Dig. Ala. Rep. pp. 191–193.

■ This is aside from the question that the witness Weaver stated that one of defendants tried to get him to make a false statement as to the capacity in which he acted in cutting and removing timber in question, or a part thereof, from said land. The general authorities on attempts to suppress evidence or suborn perjury, being in the nature of an admission against interest, are collected in 22 C. J. § 355, p. 321. See, also, 1 Enc. of Ev. 363, 364. Such evidence should have gone to the jury in the nature of an admission that such defendant was wrong in his contention before the court. The case should be retried by the jury.

Reversed and remanded.

ANDERSON, C. J., and SAYRE and BROWN, JJ., concur.