69 So.2d 261

**POLICE & FIREMEN'S INS. ASS'N**

**v.**

**MULLINS.**

**6 Div. 467.**

Supreme Court of Alabama.

Oct. 29, 1953.

Rehearing Denied Jan. 14, 1954.

Jackson, Rives, Pettus & Peterson, Birmingham, for appellant.

Dan P. Barber and Leigh M. Clark, Birmingham, for appellee.

SIMPSON, Justice.

The action was on a fraternal benefit insurance policy for the accidental death of insured, Chester L. Mullins, a former police captain of the Birmingham Police Department, caused by monoxide poisoning. The policy provided for payment to the beneficiary, his wife, of $250 for death due from natural causes or $2,500 for accidental death as defined in the policy and the by-laws of the defendant company.

The defendant offered to pay the $250 as for death due to natural causes but refused to pay the increased amount for accidental death. Plaintiff declined this offer and brought this action under the accidental death provisions of the policy and on verdict a judgment was rendered for the amount, from which the defendant brings this appeal.

Appellant urgently insists it was entitled to the general affirmative charge with hypothesis on the theory that the evidence was without conflict that Captain Mullins died from natural causes and not by accident, as those terms are defined in the policy and by-laws of the defendant association. The insistence has been supported by cogent argument both orally before the court on submission and in written brief. This is the main question. On a studious consideration, we have concluded the position to be untenable.

The insured was taken suddenly sick after breathing a considerable amount of smoke escaping from his basement furnace and died about ten or eleven hours later. The question was whether he died as a result of carbon monoxide poisoning from the smoking furnace or whether his death was due to heart attack from natural causes. The policy and the by-laws precluded a recovery for death resulting from heart disease or heart involvement. The policy provided:

"I agree that the benefits of this Association so far as accidental injury is concerned shall not extend to any bodily injury, or death, happening directly or indirectly in consequence of disease, or to an injury, of which this 'Association is not notified within fifteen (15) days of its occurence, or to any death or disability, which may be caused wholely or in part by mental or bodily infirmities or disease, except the payment of sick benefits as provided in the By-Laws. * * *"

Following is the pertinent excerpt from the By-Laws of the Association:

"Provided, always that death from heart diseases and from heart involvements of any character, septicemia, erysipelas or ptomaine poisoning shall not be adjudged to have been the result of an accident or accidental means, but shall be adjudged to have been the result of natural causes and only benefits paid for death from natural causes shall be paid."

The defendant contends the evidence was without conflict that insured, at the time of his death, had a heart involvement which proximately caused his death and that if there was monoxide poisoning it was only one contributing cause which, operating with the previous heart involvement, conduced to that result, thereby entitling it to the affirmative charge. Prudential Ins. Co. v. Calvin, 227 Ala. 146, 148 So. 837.

This argument is rested on the testimony of defendant's witnesses, Doctors Kwong and Casey, pathologists, who testified that a post-mortem examination performed by them on the deceased's body and visceral organs showed he died as a result of coronary occlusion with antecedent atherosclerosis of long standing and that there was no indication of CO poisoning. C. D. Brooks, Associate State Toxicologist, also gave testimony as to his examination of parts of the visceral organs, which tended to corroborate the testimony of the two pathologists.

On the basis of this evidence, defendant strongly relies upon our decisions holding the affirmative charge with hypothesis should be given upon the clear, unimpeached and uncontradicted evidence of expert witnesses, such as practitioners of the medical profession, rested on facts ascertainable by the aid of instruments, learning and experience—facts outside the knowledge of laymen. Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 155 So. 755; New York Life Ins. Co. v. Zivitz, 243 Ala. 379, 10 So.2d 276, 143 A.L.R. 321.

■ But the weight of such testimony is subject to all the rules appertaining to the testimony of other witnesses within the realm of their knowledge. And the jury is not bound by the testimony of such experts unless uncontradicted and pertaining to subjects for experts alone. Commonwealth Life Ins. Co. v. Harmon, supra; Pollard v. Treadwell, 234 Ala. 615, 176 So. 452.

As is epitomized in the fifth headnote of National Life & Accident Ins. Co. v. McGhee, 238 Ala. 471, 472, 191 So. 884, 885:

"In an action on an accident policy wherein evidence is conflicting as to whether accident was sole proximate cause of the insured's death, liability of the insurer is for the jury, notwithstanding opinion of experts, given in evidence, that does not exclude reasonable field of common knowledge and experience as to the result."

This case is ruled by the last stated principle, since there was evidence pointing to the conclusion that the sole proximate cause of the insured's death was monoxide poisoning, although, as stated, the pathologists' testimony tended to support the contrary conclusion. Following is a brief summary of the plaintiff's evidence: Captain Mullins, the insured, died at the age of fifty-four years on March 21, 1951, at about 5:30 A.M. at his home in Birmingham, Alabama, where he had resided for about fifteen years. Prior to that time he had been a healthy, able-bodied man; had seen his personal physician a few days before on a nonprofessional visit and appeared in sound health; had never had any history of heart trouble and had always been active and vigorous. The day before his death he had done a full day's work; had come home and eaten supper about 6:30 or 7:00 P.M. After supper he took the table scraps to his basement to feed his dog and to fix the furnace fire, which was fired by coal and coke. The house was smoky and the children had complained of smoke and odor in the house early in the evening. Upon his return from the basement he complained his lungs were filled with basement smoke and that he was short of breath. Meanwhile, Mrs. Mullins had gone to bed feeling more than odinarily drowsy and Captain Mullins came into the bedroom complaining of feeling peculiar and suddenly vomited on the floor. He then went to the bathroom and vomited several more times. While he was in the bathroom the youngest child, Jim, came in and fainted on the floor. When insured called his wife and she came in to aid her younger son, Jim, she fainted and fell on the floor. Everyone in the family, Captain and Mrs. Mullins and their four children, all became sick at the stomach and vomited profusely and Mrs. Mullins continued to be nauseated

and sick during the entire night and the following day. About ten P.M. the doctor was called and he diagnosed the trouble over the telephone as ptomaine poisoning and prescribed "Kaopectate." A dose of this medicine was taken about twelve o'clock by members of the family and seemed to give temporary relief, but about four A.M. Mrs. Mullins was awakened by the labored breathing of her husband. She went to investigate and found he was cold and unconscious. The doctor was called and he came at once and gave him a hypodermic and then left. Soon thereafter he was again summoned and when he returned about five-thirty A.M. Captain Mullins was dead. Early the next morning when someone attempted to fire up the furnace it was still smoking and when the fire box door was opened a great volume of smoke came out of it. One person familiar with furnaces discovered that the control chain for the draft trap which was supposed to work automatically was not working free, but when this defect was remedied the furnace began to draw and the smoking began to subside. A furnace man was called that day and he found that it was choked up and when in that condition smoke comes out in front through the fire box. All of the neighbors and relatives, several in number, who came to the house the night of Captain Mullins' illness or the next morning after his death were affected to a certain extent in the same manner. Mr. McKnight, who came that night to bring the medicine from the drug store, felt dizzy and had a headache when he went home. His wife, who had come over that night to give aid, also became ill and fainted. So not only were all the members of the family stricken, but the several visitors who came to the house that night and the next morning were to some extent adversely affected and were afflicted with dizziness, headaches or nausea. Not only were human beings afflicted, but the two dogs in the basement were affected. One of the dogs was found very sick next morning and the other dog was dead. The dog which had died was higher up on a ledge behind the furnace than the other dog, which was on the floor, thereby indicating that the dead animal had gotten a severer dose of the smoke than the dog lying on the floor. It is borne out by the record that such a condition as prevailed in the house, with the smoke from the basement furnace, would produce carbon monoxide; that carbon monoxide (CO) is composed of one part carbon and one part oxygen and is a deadly poison. There was testimony from the defendant's witnesses that medical science recognizes it as a fact that people are killed by carbon monoxide escaping into the house by reason of incomplete combustion of fuel in furnaces. This evidence alone furnishes a fair inference that Captain Mullins' death was caused by carbon monoxide poison, since prior to that time he was in sound, vigorous health, without any intimation of heart affliction. But there was more. Other features of the evidence tended to point to the same conclusion. The evidence shows that carbon monoxide poison adversely affects animals as well as human beings. The viscera of the dead dog was examined by Mr. Randle Glenn, a chemist and assistant director of the Board of Health of Jefferson County, and by C. D. Brooks, Associate State Toxicologist. Both testified that the viscera of this dog was unusually red, one saying that it was cherry red and that this was indicative of carbon monoxide poisoning. And the evidence is without dispute that one of the results of such poisoning is the extreme reddening of the organs of the body discoverable upon an autopsy. Insured's body had been embalmed before autopsy and this prevented detection of CO poison by color determination. Mr. Brooks testified the condition of the viscera of the dog was evidence of carbon monoxide poisoning. Thus the jury could clearly infer that Captain Mullins' death and the death of his dog were caused by the same poisoning. Indeed, it would be almost incredible that by an unusual coincidence Captain Mullins and the dog both died at the same time of heart failure.

The conclusion of Doctors Kwong and Casey that the cause of the death of Captain Mullins was coronary occlusion with antecedent atherosclerosis was principally predicated upon their gross and microscopic findings. Yet the evidence tended to show

that to a considerable extent the same manifestations are to be found in autopsy cases of death by CO poisoning. Indeed, Dr. Casey, the more experienced of the two pathologists, testified on cross-examination that some of the findings he considered significant in substantiating his diagnosis of insured's death he would expect to find also in death from CO poisoning. There was also competent documentary authority introduced which tended to establish the same fact.

It therefore must be clear to the impartial mind that it was for the jury to determine the cause of the insured's death under the conflicts presented by the evidence. It may have been that the insured, at his age, did have some degree of atherosclerosis, but it was open to the jury to conclude that any heart involvement was not causal but resultant. In such case there would be liability under the policy. As was said in Prudential Ins. Co. v. Calvin, supra, 227 Ala. 153, 148 So. 843:

"* * * the exception in the policy is against liability for death produced by the accident and disease, which the accident did not produce, and not from liability for death caused by disease or infirmity, which the accident itself did produce * * *."

So even though Captain Mullins, at his age, may have had the antecedent trouble described by the two pathologists, if that trouble did not proximately contribute to his death but, to the contrary, the accident itself was the sole proximate cause of death, there would still be liability under the policy.

We think it sound to hold, therefore, that the refusal to the defendant of the general affirmative charge with hypothesis was without error.

The foregoing considerations dispose of the importat question. The other matters pressed on us for a reversal are more or less incidental, are clearly untenable, and will be given short treatment.

Following is one of the exceptions in the by-laws to a recovery for accidental death:

"Provided further, that death resulting from injuries with any heart involvements shall have been the result of accidental violence leaving visible marks on the external surface of the body and such injuries, independent of any and all other reasons, were of sufficient force to be the direct and sole cause of the member's death."

A special plea plead this exception as a defense and it is contended by the appellant that the general affirmative charge requested on this plea should have been given. The argument overlooks the fact that the requirement of visible marks of violence on the body of the deceased is conditioned on death resulting from injuries with heart involvement. So what we have said hereinabove likewise suffices as answer to this contention, as well as to the others predicated on the same theory.

It is next argued that no sufficient proof of accidental death was furnished the defendant, as required by the by-laws of the Association, and that the defendant's special plea setting up this defense was proven without contradiction, resulting that it was entitled to the general affirmative charge on that plea. We do not so construe the evidence but, this aside, the replication of the plaintiff setting up a waiver of the requirement was sufficiently proven to require the issue to be submitted to the jury. There was testimony that the duly authorized agent of the company, within the required period for submitting the proof, denied liability under the accidental death provision. This conduct could be considered by the plaintiff as a waiver of the requirement. Shears v. All States Life Ins. Co., 242 Ala. 249, 5 So.2d 808; Box v. Metropolitan Life Ins. Co., 232 Ala. 321, 168 So. 217.

It is also argued that error prevailed in permitting Associate Toxicologist Brooks to testify as an expert as to the symptoms of CO poisoning. It is well recognized that the science of toxicology, among other things, treats of poisons and their effects and their treatment and recognition. The witness was shown to have

had extensive training and wide experience in this field. His testimony disclosed he was fully conversant with the subject and was therefore properly admitted. It is not the law that only a medical doctor may testify as to physical symptoms on the human being. If the witness is shown to have special qualification in that particular field and knowledge of the subject beyond that of the average laymen so as to give reliable testimony, he is not disqualified. Blakeney v. Alabama Power Co., 222 Ala. 394, 133 So. 16; Hicks v. State, 247 Ala. 439, 25 So.2d 139.

Similar rationale also sustains the ruling of the court in permitting witness Brooks to identify as an authority on the subject of carbon monoxide poisoning and in permitting in evidence the publication, "Public Health Bulletin No. 290, Carbon Monoxide: Its Hazards and Mechanism of Its Action," published by the Federal Security Agency of the United States Public Health Service and prepared under the direction of the Surgeon General. Brooks was shown to be sufficiently qualified to identify the publication as an authority and even though it was not peculiarly a medical work, it dealt authoritatively with the particular science, reporting what various scientists had concluded on the subject, and was entitled to go to the jury for what it was worth. See City of Dothan v. Hardy, 237 Ala. 603, 188 So. 264, 122 A.L.R. 637, and cases cited.

Nor was there error in permitting witness Brooks to testify that it was a recognized fact established in his profession that people may be and are killed by CO poisoning as a result of defective or incomplete combustion of coal or coke in home furnaces. His thirteen years' experience as Associate State Toxicologist had brought him in intimate touch with numerous such cases and we do not think it was an invasion of the province of the jury to allow the witness to so testify.

We agree with appellant that requested charge No. 1 given for the plaintiff might be regarded as misleading. It was not, however, erroneous since the plaintiff was entitled to a verdict in some

amount. Whitfield v. McClendon, 251 Ala. 591, 38 So.2d 856; National Life & Accident Ins. Co. v. Lokey, 166 Ala. 174, 52 So. 45. Therefore, to avert any misleading tendency, it was incumbent upon the defendant to have requested an explanatory charge. We are impressed that the oral charge of the court in connection with the many given charges requested by the defendant fairly presented the issues to the jury without prejudice to the defendant.

The case was well tried. It has been ably argued, but we find no error to reverse.

Affirmed.

LIVINGSTON, C. J., and GOODWYN and CLAYTON, JJ., concur.