236 So.2d 328

**The UNION CENTRAL LIFE INSUR-ANCE COMPANY**

v.

**Mrs. Willie E. SCOTT.**

**6 Div. 539.**

Supreme Court of Alabama.

May 28, 1970.

Spain, Gillon, Riley, Tate & Ansley and Foster Etheredge, Birmingham, for appellant.

No brief for appellee.

LAWSON, Justice.

The suit below was for payments allegedly due under a double indemnity provision in a life insurance contract.

The defendant insurance company, which is the appellant here, had issued a life insurance policy covering the life of Charles W. Scott. The policy was in the amount of $2,000 with a supplemental provision for double indemnity benefits for death by accident as defined in the policy. The policy provided that:

"The double indemnity benefit shall be payable only if the death of the insured shall result directly, independently and exclusively of all other causes, from bod-

ily injury effected solely through accidental, external and violent means, and only if such death shall occur within ninety days after the date of such injury; provided that death occurring * * * as a result directly or indirectly of any bodily or mental disease or infirmity * * * is not an accident hereby insured against."

The policy, issued in 1924, was in full force at the time of Mr. Scott's death on August 15, 1963, and the insurance company paid to the beneficiary, Mrs. Willie E. Scott, the widow of Charles W. Scott, the $2,000 called for in the face of the policy, but declined to make any payment under the double indemnity provision, taking the position that Mr. Scott's death resulted from encephalomalacia and cholesterosis, and not as a result of an accident. Thereafter, this suit was instituted by Mrs. Scott against the insurer, The Union Central Life Insurance Company, a corporation.

In the trial below, the jury returned a verdict in favor of the plaintiff and judgment was entered pursuant to such verdict.

The defendant's motion for a new trial being overruled, it appealed to this court.

We will refer hereinafter to the parties as plaintiff and defendant, just as they appeared in the court below.

Defendant insists that it was entitled to the general affirmative charge with hypothesis on the theory that "the only testimony in the case, which stands uncontradicted and undisputed, is that a disease" directly or indirectly caused the death of Mr. Scott, the insured.

In construing clauses similar to the clause, "The double indemnity benefit shall be payable only if the death of the insured shall result directly, independently and exclusively of all other causes, from bodily injury effected solely through accidental, external and violent means," which clause appears in the policy with which we are presently concerned, we have held that if an accident aggravated a disease and has-

tened the death of the insured, the accident is yet considered the proximate cause of the insured's death, notwithstanding the gravity of the disease, or that the accidental injury would not have been fatal but for the infirmity.—First Nat. Bank of Birmingham v. Equitable Life Assur. Soc. of United States, 225 Ala. 586, 144 So. 451, and cases cited; Adkins v. Metropolitan Life Ins. Co., 235 Ala. 417, 179 So. 382; Liberty Nat. Life Ins. Co. v. Reid, 276 Ala. 25, 158 So.2d 667; Independent Life & Acc. Ins. Co. of Jacksonville, Fla., v. Maddox, 284 Ala. 532, 226 So.2d 315.

But the cases last cited lay down a different rule where the policy sued on not only contains a clause similar to that quoted in the preceding paragraph, which is sometimes referred to as the general clause, but also contains a clause similar to the following clause found in the policy here involved: " * * * provided that death occurring * * * as a result directly or indirectly of any bodily * * * infirmity * * * is not an accident hereby insured against." The provisions last quoted are sometimes referred to as the additional clause. Where the policy contains the so-called additional clause, as well as the general clause, the cases last cited above indicate that if the disease, in cooperation with the accidental injury, is an efficient cause of death, then there can be no recovery for accidental death.

But in the *Equitable case, supra,* after stating the effect of the presence in the policy of the additional clause, we said:

"But this does not mean that mere feebleness, nor predisposition to recurrence of former disease, nor every infirmity which may aggravate the effects of an accidental injury, is to be regarded as the cause of death."

In Liberty Nat. Life Ins. v. Reid, *supra,* where the policy sued on contained an additional clause, we observed:

"If an injury starts a chain reaction resulting in death, recovery may be had

even if one of the links in the chain is old age, frailty and some links are dormant diseases or physical condition without which the chain would be broken. Each case must be particularized. New York Life Insurance Co. v. McGehee, 5 Cir., 260 F.2d 768." (276 Ala. 33, 158 So.2d 674)

In Prudential Ins. Co. v. Calvin, 227 Ala. 146, 148 So. 837, where the policy sued on also contained a so-called additional clause, we said on rehearing as follows:

"The provision in the policy contract, viz., 'or directly or indirectly from bodily or mental infirmity or disease in any form,' means, and can only mean, when construed in connection with the precedent clause, that, if the insured was suffering at the time of the accident with some infirmity or disease, and the accidental injury, operating with the disease, produces death, then this would not create liability; but, where the accident directly and immediately, exclusive of other causes, produces the bodily infirmity or disease, and death results therefrom, then the accident must be held to be the sole proximate cause of the death.

"To hold as contended for by appellant, this clause in the policy contract would require a construction that it embraced accidents, which produced immediate death, without intervening complications, which the accident itself produced.

"To state it in different language, the exception in the policy is against liability for death produced by the accident and disease, which the accident did not produce, and not from liability by death caused by disease or infirmity, which the accident itself did produce. (Authorities cited)

"There were tendencies of the evidence which did not justify the court in giving, at the request of the defendant, the affirmative instruction in its behalf. The evidence required the submission of the case to the jury." (227 Ala. 153, 148 So. 843)

In New York Life Ins. Co. v. McGehee, 5 Cir., 260 F.2d 768, the defendant insurance company took the position that at the time of the accident the insured had arteriosclerosis, among other conditions, which contributed to or caused his death. The policy sued on in that case contained both a general clause and the additional clause.

In Independent Life & Acc. Ins. Co. of Jacksonville, Fla., v. Maddox, *supra,* we quoted approvingly the language hereafter set out from the opinion in New York Life Ins. Co. v. McGehee, *supra:*

"A review of the Alabama cases and the decisions of this Court shows that considerable latitude must be allowed the jury in determining the question of causation. An insurer cannot escape liability simply by showing that some disease may have contributed to some extent to the insured's death. Most elderly people have some ailment, some latent disease. When an old person is injured, almost invariably an ailment is aggravated, a dormant disease is activated, and the effects of the injury intensified because of general frailty and lack of resistance to illness. Progressive weakness and increasing complications follow any time an old person is put to bed for any length of time. In every case therefore it is difficult to separate the effects of the accident from the effects of disease. The insurer would have us hold that there can be no recovery unless Death is present at the scene of the accident, or openly waits in continuous attendance on an injured insured from the moment of injury to the moment of death. Alabama courts, and this Court, take a more reasonable view. * * *"

The rule in this state is that in civil cases the question must go to the jury if the evidence or the reasonable inferences therefrom furnish a mere gleam, glimmer, spark, the least bit, the smallest trace, a scintilla, in support of the theory of the complaint.— Lankford v. Mong, 283 Ala. 24, 214 So.2d 301, and cases cited; Payne v. Jones, 284 Ala. 196, 224 So.2d 230. And such is the

rule if the scintilla of adverse evidence is developed by the cross-examination of any witness, thus presenting a jury question.— Jones v. Bell, 201 Ala. 336, 77 So. 998; Chestang v. Kirk, 218 Ala. 176, 118 So. 330.

It is equally well established by our cases that in determining the propriety of a general affirmative charge when requested by the defendant, the evidence most favorable to the plaintiff must be accepted as true.—Purity Ice Co., Inc. v. Triplett, 257 Ala. 116, 57 So.2d 540; Key v. Dozier, 252 Ala. 631, 42 So.2d 254.

We come now to a summation of the evidence adduced at the trial below.

On August 15, 1963, Mr. Scott, the insured, was injured in an automobile accident on U. S. Highway 31 approximately 3.7 miles north of the city limits of Clanton in Chilton County, Alabama. Mr. Scott was driving a 1961 Falcon station wagon, which was hit in the rear by another automobile. The accident occurred in the main traveled portion of the highway. After the accident Mr. Scott was found lying on the shoulder of the highway. He was conscious and upon request he showed his driver's license to a state trooper who had arrived at the scene shortly after the accident. The trooper made no examination of Mr. Scott's person at the scene of the accident, but he called for an ambulance, which arrived within a short time. Mr. Scott was taken to a Clanton hospital in the ambulance. He was dead upon arrival at the hospital.

The plaintiff, the widow of the insured, the beneficiary in the policy sued on, testified substantially as follows:

Mr. Scott died on his sixty-sixth birthday. He had been married forty-two years. Mr. Scott operated a wholesale dry goods business in Birmingham known as Birmingham Wholesale Hosiery, where he had worked every day for about fifteen years. He was in a hospital at age twenty-two when his tonsils were removed. But he had "never been sick from anything in the forty-two years we were married, never been in the hospital." He had never made any complaints to her about his health. She was at their place of business when Mr. Scott left on the morning of April 15, 1963. He made no complaint about his health before leaving. He appeared to feel fine. After being notified of the accident, she was driven to the hospital in Clanton, where she was informed that the body of her husband had been removed. While in Clanton she saw the automobile which Mr. Scott had been driving. It was in a junk yard and was completely demolished. She could not get anything for the automobile, not even for junk. The automobile was in good condition when Mr. Scott left in it on the morning of the accident. After she returned to Birmingham she visited a funeral home where she saw the body of her husband. He had "marks" on his body. His knee was "split open," his leg was "split," and his body, including his chest, was bloody. He was "hurt in his chest and in his neck." His clothes "were torn off of him."

The plaintiff offered into evidence the certificate of death. Under the medical certification part of that certificate, the cause of death was fixed as follows:

"Medical Certification

"18. Cause of death (enter only one cause per line for (a), (b) and (c).

"Part 1. Death was caused by: Immediate cause

"(a) Encephalomalacia.

"Interval between onset and death

"Condition, if any, which gave rise to above cause (a), stating the underlying cause last.

"Due to (b) Cholesterosis. _____

"Due to (c) Automobile accident _____"

No entry was made in Section 20a of the Certificate of Death as to any finding of accident, suicide or homicide.

The only witness for defendant was Dr. Lamar C. Meigs, a pathologist, who performed an autopsy on the body of Charles W. Scott after it had been embalmed and after it had undergone a "certain amount of restoration prior to the funeral arrangements." Dr. Meigs testified that he graduated from the Medical College of Alabama in 1951 and after interning at Cincinnati General Hospital for one year, he began the general practice of medicine at Dadeville, Alabama, where he remained until sometime in 1962, when he joined Dr. Albert E. Casey in the practice of pathology at the West End Baptist Hospital in Birmingham. Dr. Casey is the chief pathologist of that hospital.

On direct examination Dr. Meigs explained in some detail the manner in which the autopsy was performed, which we do not need to delineate here.

Dr. Meigs testified on direct examination that the only trauma which he observed on the body of Mr. Scott during an external examination were "* * * a small abrasion on the surface of the left knee and a small bruise on the front portion of the left leg * * *" He further testified that the autopsy failed to reveal any "evidence that trauma caused Mr. Scott's death."

In fact, on direct he testified, in substance, that a disease caused Mr. Scott's death, namely, encephalomalacia, a softening or dying of the tissues of the brain, which resulted from arteriosclerosis, commonly referred to as hardening of the arteries. Dr. Meigs testified on direct that one of the arteries leading to the brain was completely occluded and that another artery leading to the brain was ninety per cent occluded. The occlusion was caused by the presence of cholesterol, which was calcified to such an extent that the witness was unable "to cut a cross-section with a

scalpel, it required more sections from the scissors."

Also on direct Dr. Meigs testified, in effect, that the presence of cholesterol in arteries is usually "concurrent with increasing age" but that "in some instances it may occur at early stages at the age of 20 * * *"

Dr. Meigs testified on direct examination that his postmortem examination revealed signs of scarring, which are usually compatible with an old coronary occlusion and that he discovered ecchymosis (bruising) of the pericardium and of the epicardium, which ecchymosis or bruising was produced by "blood force."

The pericardium is "the fibroserous sac that surrounds the heart" and the epicardium is "the layer of the pericardium which is in contact with the heart."—Dorland's Illustrated Medical Dictionary, 24th Edition.

On cross-examination Dr. Meigs testified in pertinent part as follows:

At the time he performed the autopsy he had been specializing in pathology for about fourteen months. He did not perform any autopsies while he was in the general practice. Dr. Casey assigned the witness to do the autopsy on the body of Mr. Scott. Dr. Casey did not see the "external body" but he did see the "organs" and tissue used in the microscopic examinations.

The witness's examination of the body of Mr. Scott disclosed that the front surface of "the artery and of the sac of the heart" were bruised.

In another trial he had testified that he did not know what had "precipitated" Mr. Scott's death. He explained, however, that on that occasion he did not use the word "precipitated" as being synonymous with "cause." The word "precipitated," according to the witness, "means such events that may trigger off the cause." Dr. Meigs, in answer to the question as to the cause

of death, stated "The cause of death was occlusion of the left internal caratoid artery and with occlusion of the left side of the brain."

The witness stated that he was familiar with the "medical terminology for shock"; that "it might be correct to say that primary shock is a type of shock which is manifested after an injury * * *"; that primary shock might result from fright or just the shock of an accident; that he did not know of a documented case, but a person might receive shock from "something as simple as a sudden fall in the water." Witness stated that there are many causes of shock but the definition of the word and "the route by which they [apparently either shock or its causes] are produced is not completely understood."

In response to the question, " * * * when you have shock, the circulatory system is clogged up, is it not?," the witness replied, "That is one way to put it, yes." The witness was asked what happens to the walls of an artery when a person goes into shock, to which question he replied: "In general, they lose their own ability to contract and there is a certain amount of that between the vessels and certain arteries and muscles in the body." He stated that when one goes into shock an artery may tend to close up and " * * * you have got pressure on a place *. * *" According to the witness, blood carries oxygen to the brain and without oxygen the cells of the brain cannot survive; that lack of adequate circulation of blood through the arteries would cause the brain cells "to starve for lack of oxygen." When the brain cells starve for lack of oxygen they will eventually die. The thing that was wrong with Mr. Scott was "the cells of the brain died." The witness found fluid in the "tissues" which are "constant features of the cause of death after shock * * *"

On further cross-examination, Dr. Meigs testified in substance that "one cause among many" of the "circulatory slowdown" caused by shock is a "neurological

change"; that shock could cause the death of a person who had nothing wrong with his arteries; that the various types of shock "varies with any individual"; that a person could die of shock because of "slowed circulation of the blood" whether "he had pinpoint holes through his vessels or through his arteries or whether he had clear arteries."

The defendant offered in evidence the report of the autopsy from which Dr. Meigs refreshed his recollection during the course of his testimony. The report, which was signed "Albert E. Casey, M. D. Pathologist" and "L. C. Meighs, M. D.," (sic) need not be summarized here in that its contents were substantially stated by Dr. Meigs.

In this case, the evidence is without dispute that the insured was involved in an accident shortly before his death; hence our recent case of National Life and Accident Insurance Company, Inc., a Corporation, v. Catherine L. Allen, as Executrix, etc., 285 Ala. 551, 234 So.2d 567, is not apposite here.

■ The death certificate was not conclusive against the beneficiary as to the cause of the insured's death. It has only prima facie effect as to the facts stated therein.—§ 42, Title 22, Code 1940, as amended. See Act No. 492, approved July 9, 1943, Acts of Alabama 1943, p. 454; Aetna Life Ins. Co. v. Beasley, 272 Ala. 153, 130 So.2d 178; Jefferson Standard Life Ins. Co. v. Wigley, 248 Ala. 676, 29 So.2d 218, and cases cited; United Security Life Ins. Co. v. Clark, 40 Ala.App. 542, 115 So.2d 911.

■ The plaintiff had the right to try to contradict the facts as stated in the death certificate. Jefferson Standard Life Ins. Co. v. Wigley, *supra*. Her testimony to the effect that insured was apparently in good health prior to the accident was not without evidentiary value and was contradictory of the certificate of death.—Scott v. National Life & Acc. Ins.

Co., (Kansas City Court of App., Mo.), 281 S.W. 67.

The defendant's expert witness, as we have shown above, testified on direct examination to the effect that the insured's death resulted from the death of brain cells, which was caused by the inability of the arteries to transport blood to the brain because the arteries were clogged with cholesterol.

■ On the basis of this evidence, defendant relies upon our decisions holding the affirmative charge with hypothesis should have been given upon the clear, unimpeached and uncontradicted evidence of expert witnesses, such as practitioners of the medical profession, rested on facts ascertainable by the aid of instruments, learning and experience—facts outside the knowledge of laymen.—Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755; New York Life Ins. Co. v. Zivitz, 243 Ala. 379, 10 So.2d 276, 143 A.L.R. 321.

But the weight of such testimony is subject to all the rules appertaining to the testimony of other witnesses within the realm of their knowledge. And the jury is not bound by the testimony of such experts unless uncontradicted and pertaining to subjects for experts alone.—Commonwealth Life Ins. Co. v. Harmon, *supra;* Pollard v. Treadwell, 234 Ala. 615, 176 So. 452. As is epitomized in the fifth headnote in National Life & Accident Ins. Co. v. McGhee, 238 Ala. 471, 472, 191 So. 884:

"In an action on an accident policy wherein evidence is conflicting as to whether accident was sole proximate cause of the insured's death, liability of the insurer is for the jury, notwithstanding opinion of experts, given in evidence, that does not exclude reasonable field of common knowledge and experience as to the result."

■ This case is ruled by the last-stated principle, in view of the plaintiff's testimony that the insured was apparently in good health and worked daily without any complaint of physical disability.—Commonwealth Life Ins. Co. v. Harmon, *supra;* Ball v. National Life & Acc. Ins. Co. of Nashville, Tenn., 270 Ala. 265, 118 So.2d 724; Shaw v. American Ins. Union (St. Louis Court of App., Mo.), 33 S.W.2d 1052. Also it was the jury's prerogative to evaluate the testimony given by defendant's expert witness on direct examination in the light of testimony elicited from him on cross-examination to the effect that primary shock could so affect arteries as to prevent them from conveying blood to the brain, which would result in the death of brain cells, which, as shown above, the defendant's expert witness testified on direct examination caused the death of the insured.

In Police & Firemen's Ins. Ass'n v. Mullins, 260 Ala. 173, 69 So.2d 261, we affirmed a judgment in favor of the plaintiff rendered in a suit brought on a fraternal benefit insurance policy which contained clauses similar to those with which we are concerned on this appeal. In that case the experts testified that the insured died as a result of coronary occlusion with antecedent atherosclerosis of long standing and that there was no indication of carbon monoxide poisoning, which the plaintiff contended caused the death of the insured. There was no expert testimony to the contrary. Based on the testimony of lay witnesses as to the apparent good health of the insured prior to the time he became ill and on testimony going to show the circumstances existing in the home of the insured at the time he was stricken, we held that the trial court did not err in refusing to give the general affirmative charge with hypothesis requested by the defendant. To like effect is American Nat. Ins. Co. v. Reed, 26 Ala.App. 350, 160 So. 543.

In view of the foregoing, we hold that the trial court did not err in refusing the defendant's requested affirmative charge with hypothesis, nor in denying its motion for a new trial because of the insufficiency of the evidence to support the verdict.

■ Error is assigned as to the refusal of the trial court to give defendant's requested Charge 12, which reads:

"Gentlemen of the Jury, I charge you that if any of your number is not reasonably satisfied from all the evidence that the plaintiff is entitled to recover, you cannot find a verdict for the plaintiff in this case."

This is what is sometimes referred to as a "single juror" charge. Under the recent decisions of the appellate courts of this state the refusal of such a charge does not constitute reversible error.—Greyhound Corporation v. Brown, 269 Ala. 520, 113 So. 2d 916, and cases cited.

Moreover, the substance of Charge 12 was covered in the court's oral charge where it was said: "It is the law of the Court, Gentlemen, that the verdict may be returned by you only if all twelve of you agree to the verdict."—§ 273, Title 7, Code 1940; City of Birmingham v. Bowen, 254 Ala. 41, 47 So.2d 174.

Assignments of Error 25, 26 and 27 are argued in bulk. They are to the effect that the trial court erred in refusing to give at the request of the defendant certain written charges. Assignment 25 relates to refused Charge 18. Assignment of Error 26 relates to refused Charge 19 and Assignment of Error 27 deals with the refusal of Charge 20.

Charges 18 and 19 read:

"18. I charge you that the plaintiff has the burden to reasonably satisfy you from all the evidence that the death of Charles Walter Scott was the result directly, independently, and exclusively of all other causes, from bodily injury effected solely through accidental, external and violent means."

"19. I charge you that if you are not reasonably satisfied from all the evidence that the death of Charles Walter Scott was the result directly, independently, and exclusively of all other causes, from bodily injury effected solely through accidental, external and violent means, then you cannot return a verdict in favor of the plaintiff and against the defendant."

■ In our opinion, Charges 18 and 19 were refused without error. They deal with the provisions of the so-called general clause which, as we have heretofore shown, we have construed "to mean that the accident shall be the proximate cause of death and not exclusive of other conditions, means or circumstances."—Benefit Ass'n of Ry. Employees v. Armbruster, 217 Ala. 282, 284, 116 So. 164, 166; Independent Life & Acc. Ins. Co. of Jacksonville, Florida, v. Maddox, *supra*. Charges 18 and 19, in our opinion, are misleading in that they are subject to the construction that plaintiff could not recover unless the accident was the exclusive cause of the death of insured.

Charge 20 reads:

"I charge you that if you are reasonably satisfied from the evidence that the death of Charles Walter Scott was the result directly or indirectly of any bodily or mental disease or infirmity, then you cannot return a verdict in favor of the plaintiff and against the defendant."

■ Charge 20 relates to the so-called additional clause and is not related to Charges 18 and 19, which are concerned with the general clause. We have held many times that where unrelated assignments of error are argued in bulk, that is, are grouped and argued together, and one is found to be without merit, the others will not be considered.—State v. Barnhill, 280 Ala. 574, 196 So.2d 691, and cases cited. Since we consider Assignments 25 and 26 to be without merit, we need not consider Assignment 27, which deals with Charge 20.

We will observe, however, that the matter with which Charge 20 is concerned was substantially and fairly given to the jury in defendant's given Charges 22 and 23.—§

273, Title 7, Code 1940; Pybus v. McKinney, 277 Ala. 419, 171 So.2d 235.

The judgment is affirmed.

Affirmed.

LIVINGSTON, C. J., and MERRILL, HARWOOD and MADDOX, JJ., concur.