On November 30, 1987, Mildred King and her husband Bobby Lee King sued Spartan Food Systems, Inc. ("Hardee's"),[1] and W.A. Brown Sons, Inc. ("Brown Sons"). Mildred King sought damages for injuries she claimed to have received when she slipped and fell in a walk-in cooler manufactured by Brown 
Sons, while she was working at a Hardee's restaurant. Bobby Lee King alleged the loss of his wife's consortium. The Kings claimed that the cooler was defective and unreasonably dangerous to the user or consumer because, they alleged, water accumulated on the metal floor and caused the floor to become wet and extremely slippery. They said that Brown Sons negligently designed the cooler and failed to warn the user of the potentially dangerous floor.
This case was tried before a jury, and on March 1, 1990, the jury returned a verdict in favor of Brown Sons. The court denied the Kings' motion for new trial, and they appealed the judgment entered on the verdict. We affirm.
Mildred King was employed at a Hardee's restaurant located in Rainsville, Alabama. She testified that on December 5, 1985, she arrived for work at 4:00 a.m. and that shortly thereafter she entered the walk-in cooler to get some supplies. She said that as she was leaving the cooler she *Page 12 
slipped and fell, and she alleged that as a result of the fall, she suffered a spinal injury, which caused a 21% permanent disability.
At trial, the Kings offered the testimony of O.L. Vance as an expert to testify as to the defective condition of the cooler floor. Vance testified on direct examination that on January 19, 1990, he visited the Hardee's restaurant where Mrs. King was allegedly injured. While there, he conducted a "coefficient of friction test" (using the same shoe that King was wearing when she fell on December 5, 1985) in the area where the injury was said to have occurred.
Vance testified that the purpose of the test was to get a numerical measure of the "slip resistance" between the floor and the shoe. To obtain this measurement he placed a 25-pound weight on the shoe and then used a scale to measure the amount of force required to cause the shoe to slip.
Vance testified that a numerical coefficient of .50 was required for the floor to pass the test and be considered safe. Using this test, Vance arrived at .30 as the numerical coefficient of friction for the cooler floor and .38 for the cooler's floor mat.[2] Based on these numbers, Vance testified that the cooler floor was the "most treacherous floor surface that [he had] ever measured with the exception of a wet bathtub," and he said, "It was very dangerous." Based on his test results, Vance concluded that the cooler was manufactured in a defective condition. He further testified that the floor would not have been as dangerous if a skid strip had been used. Although Brown Sons cross-examined Vance, Brown Sons offered no expert testimony regarding the "slip resistance" of the cooler floor.
At the close of all the evidence, the Kings requested the following jury instruction:
 "[T]he testimony of an expert witness is not binding upon the jury unless it is uncontradicted and a subject exclusively within the knowledge of experts. If you are reasonably satisfied that there has been expert testimony which was uncontradicted and on a subject exclusively within the knowledge of experts you are to accept such testimony as binding on that subject."
The trial court refused to charge the jury as the Kings had requested and they properly objected, pursuant to Rule 51, A.R.Civ.P. On appeal, the Kings argue that the trial court erred to reversal; because Vance was the only expert to testify as to the defective condition of the cooler floor, they argue that his testimony was binding on the jury because, they say, it was uncontroverted and exclusively within the knowledge of an expert. We disagree.
The Kings' requested jury charge is a correct statement of Alabama law. See, e.g., Allen v. Turpin, 533 So.2d 515 (Ala. 1988); Jefferson County v. Sulzby, 468 So.2d 112 (Ala. 1985);Ex parte Blue Cross-Blue Shield of Alabama, 401 So.2d 783 (Ala. 1981). It is also the law in Alabama that "[a] party is entitled to proper jury instructions regarding the issues presented, and an incorrect or misleading charge may be the basis for the granting of a new trial." Nunn v. Whitworth,545 So.2d 766, 767 (Ala. 1989). If an objection to a jury charge is properly preserved for review on appeal, this Court will "look to the entirety of the trial court's charge to see if there was reversible error." Nelms v. Allied Mills Co., 387 So.2d 152,155 (Ala. 1980). Reversal is warranted only when the error is considered to be prejudicial. Underwriters Nat'l Assurance Co.v. Posey, 333 So.2d 815, 818 (Ala. 1976).
The strength of the jury verdict is based upon the right to trial by jury, White v. Fridge, 461 So.2d 793 (Ala. 1984), and a jury verdict is presumed to be correct. Alpine Bay Resorts,Inc. v. Wyatt, 539 So.2d 160, 162 (Ala. 1988). This presumption is strengthened by the trial court's denial of a motion for a new trial. *Page 13 
 "Upon review of a jury verdict, we presume that the verdict was correct; we review the tendencies of the evidence most favorably to the prevailing party; and we indulge such reasonable inferences as the jury was free to draw from the evidence. We will not overturn a jury verdict unless the evidence against the verdict is so much more credible and convincing to the mind than the evidence supporting the verdict that it clearly indicates that the jury's verdict was wrong and unjust."
Campbell v. Burns, 512 So.2d 1341, 1343 (Ala. 1987) (citation omitted). See also Ashbee v. Brock, 510 So.2d 214 (Ala. 1987);Jawad v. Granade, 497 So.2d 471 (Ala. 1986); White v. Fridge, supra.
The Kings argue on appeal that Vance's testimony was uncontroverted. However, the mere fact that Brown Sons did not offer an expert of its own does not render Vance's testimony uncontroverted, because an expert's testimony on direct examination can be controverted on cross-examination. See, e.g., Police Firemen's Ins. Ass'n v. Mullins, 260 Ala. 173, 69 So.2d 261 (1953); First Nat'l Bank of Birmingham v.Lowery, 263 Ala. 36, 81 So.2d 284 (1955); Union Central LifeInsurance Co. v. Scott, 286 Ala. 10, 236 So.2d 328 (1970).
The record in this case shows that Vance's testimony was far from uncontroverted. Vance's testimony on cross-examination cast doubts on the reliability and accuracy of the numerical coefficient test that he had performed on the cooler floor and which was the basis of his opinion that the cooler was defective. On direct examination he testified that the test he performed on the cooler floor was reliable and that it accurately measured the slippery nature of the floor and the floor mat. Based on the results of that test, Vance gave the opinion that the cooler was defective and unreasonably dangerous.
However, on cross-examination he testified that the test was conducted between 1:15 and 2:00 p.m. instead of shortly after 4:00 a.m., the time when Mrs. King allegedly fell. The cooler floor was cleaned at night; thus, it would have been dirtier in the afternoon when Vance conducted his test than in the early morning when Mrs. King fell. Vance also testified that he did not have any published standards to guide him in making a decision as to the "slipperiness" of the floor and that he had never tested a floor before. Vance also admitted that the shoe he used in the test was five years old and that its slip resistance would decrease with time. Furthermore, Vance could not establish any relative meaning for the numerical values he assigned to the cooler floor:
 "Q. [By Brown Sons' attorney] Have you ever tested a shoe like that on ice?
"A. [By Vance.] No. sir.
 "Q. Well, don't we have to have some idea what we're talking about relatively?
"A. I have given you relative values, I think.
 "Q. Okay. But could you tell us, just so we understand what you're talking about in terms of relationship between things, what kind of number you would be talking about with that shoe on ice?
"A. Less than .3.
"Q. All right, how much less than .3?
 "A. I won't give numerical values unless I'm permitted to actually perform the test.
 "Q. But you've never done that so that you would have some idea in your mind the way to be able to compare things?
"A. That is the case, I have not tested ice.
 "Q. Have you ever tested that shoe on what you call a skid strip?
"A. No, sir.
 "Q. All right. Do you have any idea of what the numbers would show with that shoe on a skid strip?
 "A. I think on a good slip-resistant surface that shoe would probably show you a friction coefficient well in excess of .5, I'm thinking toward .6. I can't swear to that because I haven't tested it yet.
 "Q. You don't want to tell us on ice, but you do have some idea on what you call a non-skid surface.
"A. A ballpark figure.
". . . . *Page 14 
"Q. How old was the mat?
"A. I have no idea.
 "Q. Well, didn't you observe its condition when you were there?
 "A. Condition appeared to be satisfactory except it was wet and slippery.
 "Q. How do you determine what's satisfactory condition? Was it clean or dirty?
 "A. I didn't see that it was torn or broken anywhere. There were no obvious flaws in the physical makeup of the thing. It was wet and it was slippery. . . .
 "Q. Let me ask you to assume it had been there since the store opened, which would have been some five years. Would the condition of the mat have been affected, its — whether it was slippery or nonslippery by the lapse of time and use of it?
 "A. Its slip-resistance characteristics will deteriorate with time. It's less slip-resistant at the time of my testing than at the time it was new.
 "Q. And I don't suppose you did any tests on a new mat of the same kind to be able to tell us what that would show?
"A. That's correct, sir. . . .
"Q. Damp is all you care?
 "A. That's correct, sir. Plus, when I arrived and began my testing I observed that the mat was in place over the portion of the metal floor that I ultimately did test, you understand. It was covered over. I, therefore, concluded that in all probability the floor was still reasonably clean from any previous clean up. I did not find that the floor was dirty, I found that it was damp under the mat.
 "Q. And that, of course, is another assumption that you made, right?
 "A. That's correct, sir. There was no beaded water, no running water, no standing water on it.
 "Q. Now, if this floor were not damp, did you perform any tests to see what the coefficient, the numbers would be with that shoe?
"A. I did not dry a floor and test it.
"Q. All right. You didn't try to find that out?
"A. That's correct, sir.
". . . .
 "Q. I failed to ask you something. I ask you about the age of the rubber mat. Would the age of the sole of this shoe have an effect on its resistance to sliding?
 "A. Yes, sir, a shoe like that would usually show better slip resistance when it was new.
"Q. When it was new?
"A. Usual."
This testimony called into question the accuracy and reliability of the test that Vance performed and upon which he based his opinion that the cooler floor was defective. Because the basis of Vance's opinion and his testimony on direct examination were disputed on cross-examination, "the weight of such testimony is subject to all the rules appertaining to the testimony of other witnesses within the realm of their knowledge." Union Central Life Ins. Co., 286 Ala. at 17,236 So.2d at 335. Consequently, it was the jury's prerogative to evaluate Vance's testimony on direct examination in light of his testimony on cross-examination.
Likewise, we note that the slippery nature of a floor is not a subject that is necessarily within the exclusive knowledge of experts. See, e.g., First Nat'l Bank of Birmingham v. Lowery,263 Ala. 36, 81 So.2d 284 (1955). In light of these facts, we find that the trial court did not err in refusing the Kings' requested jury charge. Accordingly, we affirm the trial court's judgment.
AFFIRMED.
ALMON, STEAGALL, KENNEDY and INGRAM, JJ., concur.
[1] Spartan Food Systems, Inc., is the parent company of the Hardee's restaurant chain. The trial court granted a motion, by Hardee's for dismissal; the Kings do not appeal that dismissal.
[2] The record shows that the cooler had a large rubber mat covering a portion of the floor. Mrs. King alleged that she fell when she stepped off the mat and onto an exposed area of the cooler's galvanized steel floor. *Page 15