These appeals arise from a wrongful death action based on a one-vehicle rollover accident involving a Volkswagen motor vehicle known as a "Thing." Volkswagen's major claim of error is that it was deprived of its right to have its theory of the case presented to the jury by proper instructions, because the trial court instructed the jury on the "crashworthiness doctrine" rather than on the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD").
Volkswagen also claims: (1) that it was entitled to an instruction on comparative fault; (2) that the trial court improperly allowed an expert to testify concerning a statistical analysis of the rollover comparison of the accident vehicle with other vehicles; (3) that the jury reached a quotient verdict; and (4) that certain jurors were guilty of misconduct in failing to disclose their prior involvement in litigation.
The accident occurred in March 1989, on Blue Ridge Boulevard in Hoover, Alabama, at a point where the boulevard passes underneath Interstate Highway 65. Blue Ridge Boulevard is a two-lane paved road with one eastbound lane and one westbound lane. The speed limit for the road is 25 miles per hour.
Many of the basic facts surrounding the accident were not disputed. Nicholas Marinelli was driving a 1973 Volkswagen Type 181 vehicle, commonly known as a "Thing." The Thing is a convertible utility vehicle with a detachable hardtop roof.[1] Passengers in the vehicle were Nicholas's sister, Susan Marinelli, who was riding in the right front seat, and her boyfriend, Brian Madonia, who was in the back seat. The three, all teenagers, had been riding around for about 30 minutes before the accident; Nicholas was attempting to teach his sister, who had no driver's license, how to drive, Nicholas had resumed driving at the intersection of Blue Ridge Boulevard and Hackberry Road, and the accident occurred while he was returning to the Marinelli residence. Although the Thing was equipped with functioning seat belts, none of the occupants was wearing a seat belt at the time of the accident.
According to Nicholas Marinelli, an unidentified animal ran in front of the Thing as he was driving eastbound on Blue Ridge Boulevard. Despite the speed limit of 25 miles per hour, he conceded that the vehicle was going "maybe 30" when he first saw the animal approaching from the right side of the road. Nicholas testified:
 "[If] it was an animal, I certainly didn't want to hit it. So I went to step on the brakes, and the brake pedal went all the way to the floor like it usually did.
 "And everything happened so fast, that I didn't feel like I had time to step on the brake pedal a second time to slow the car down.
 "And at the same time I had stepped on the brake pedal, I turned the steering wheel to the right to avoid hitting the animal.
 "And since there was no braking action and I was heading off the road at this time, I reached down and pulled up on the emergency brake, and the left rear wheel locked up and the car [skidded] out from — the rear end of the car [skidded] out to the left.
 "And when this happened, I turned my steering wheel all the way to the left. And then when I did that, it caught the car from skidding any further, and the rear end came back around. And it almost straightened out, but then it went all the way back around to the right.
 "And I didn't have enough time and everything was happening so fast, and the — my hand slipped off the wheel or something, and I couldn't turn the steering wheel back around to counteract the motion *Page 381 
of the car, and that's when the car flipped over."
(R. 571-73.)
The Thing crossed Blue Ridge Boulevard to the left, the rear of the vehicle went off the left side of the road and furrowed into the road's shoulder, and the vehicle rolled over as it reentered the road. Although the vehicle was originally travelling toward the east in the eastbound lane, the vehicle came to rest on its wheels in the westbound lane, with the front end facing to the west.[2]
At the time of the accident, the Thing's hardtop roof was not being used, and, because none of the occupants was wearing a seatbelt, they were ejected from the vehicle. Nicholas, the driver, was thrown clear of the vehicle and suffered only minor injuries. Susan suffered fatal injuries when the top right corner of the windshield frame came in contact with her head after she fell out of the vehicle. Brian fell out of the vehicle and suffered fatal injuries when an area of the right rear door came down on his abdomen. He died during surgery, from massive internal bleeding from a severely lacerated liver.
Nicholas admitted that he was aware of the Thing's brake problems before the accident. The evidence showed that the vehicle was approximately 15 years old and that Nicholas had purchased the vehicle approximately five months before the accident. He had begun experiencing brake problems a month or two after the purchase. In the five months before the accident, the brakes on the vehicle had been repaired by Alternative Garage on at least three occasions. Before the accident, Nicholas was told by a mechanic at Alternative Garage that the Thing needed new brake drums, and at the time of the accident Nicholas had an appointment to have the vehicle repaired a fourth time. Nicholas attributed the brake problems to the age of the Thing. To compensate for the problems, he "would start to brake earlier than usual and drive the car a little bit slower than [he] would usually drive if the brakes worked." (R. 590-91.) The history of the brake malfunction was never characterized by the plaintiffs as a vehicle defect.
On April 25, 1989, Lyla Marinelli, as mother of Susan Marinelli, a minor, instituted a wrongful death action in the Circuit Court of Jefferson County, Alabama, against Volkswagen Aktiengelellschaft,* Volkswagen of America, Inc., Volkswagen de Mexico S.A. de C.V. (jointly "Volkswagen"); James E. Bryan, d/b/a Alternative Garage; and various fictitiously named defendants. John Madonia, as father of Brian Madonia, a minor, also instituted a wrongful death action, on June 26, 1989, against Volkswagen, Alternative Garage, and various fictitiously named defendants. The two actions were consolidated on January 2, 1990.
Volkswagen filed an answer to the complaints and to the amendments made to the complaints. Volkswagen's answer, as amended, stated various defenses, including a lack of causal relation between the decedents' injuries and any conduct on the part of Volkswagen, a denial that the vehicle was defective, and numerous affirmative defenses, including contributory negligence, assumption of the risk, product misuse, failure to use the restraint system provided, and a defense that the decedents' injuries were caused by the acts or omissions of others. Alternative Garage also answered, making a general denial and asserting the affirmative defenses of contributory negligence and assumption of the risk. Alternative Garage was granted a summary judgment on January 29, 1990.
The trial began on April 6, 1992. At the close of the plaintiffs' case, Volkswagen moved for a directed verdict on the grounds, inter alia, that no crashworthiness claim should be presented to the jury. Volkswagen renewed its motion for directed verdict at the close of the evidence, at which time the motion was denied. Over Volkswagen's objection, the trial court instructed *Page 382 
the jury on the elements of a crashworthiness claim as established in General Motors Corp. v. Edwards, 482 So.2d 1176,1191 (Ala. 1985), and the jury, after deliberating, returned a verdict on behalf of each plaintiff in the amount of $783,333.
On appeal, Volkswagen raises five issues for our review.
 I.
Volkswagen first argues that it was deprived of its right to have its theory of the case presented to the jury by proper instructions because the trial court instructed the jury on the "crashworthiness doctrine" rather than on the AEMLD.
The trial judge charged the jury as follows:
 "The plaintiff in this case does not claim that Volkswagen caused the accident in question. But the plaintiff claims that Volkswagen — the manufacturer — is liable, meaning legally responsible, under what is known as the Alabama Extended Manufacturer's Liability Doctrine.
 "In order for the plaintiff to recover against the manufacturer, the plaintiff has the burden of proving each of the following elements: First, that the deceased was involved in an automobile accident. Well, that's obviously admitted.
 "Second, that the automobile in which the plaintiff was a passenger was manufactured by [Volkswagen]. Well, there's no question about that.
 "Third, that at the time of [the] accident, the automobile was in substantially the same condition as it was when it left the manufacturer.
 "Next, that the automobile was defective; that is to say, . . . the plaintiff must prove that the automobile did not meet the reasonable expectations of an ordinary consumer — as to its safety — because it was unreasonably dangerous, [t]hat is, . . . not fit for [its] intended purpose, which is to travel the streets and highways.
 "In order for the plaintiff to prove that the automobile was defective, the plaintiff must prove that a safer, practical, or alternative design [was] available to the manufacturer at the time it manufactured . . . the automobile.
 "The existence of a [safer,] practical alternative design must be proved by the plaintiff showing this: That the plaintiff's injuries would have been eliminated, or in some way reduced, by the use of the alternative design; and the utility of the alternative design outweighed the utility of the design actually used.
 "In deciding whether the utility of the alternative design outweighed the utility of the design actually used, factors which may be considered would include [t]he intended use of the vehicle; it[s] style; it[s] cost; desirability; safety aspects; the foreseeability of the particular accident; the likelihood of injury; the probable seriousness of the injury
if that accident occurred; the obviousness or not of the defect; and the manufacturer's ability to eliminate the defect.
 "The fifth element which the plaintiff must prove is: That the defect in the automobile proximately caused the plaintiff's injuries.
 "In summary, in order for the plaintiff to recover against the manufacturer, the plaintiff must prove, to your reasonable satisfaction, each of these five elements of the claim, as I have just explained."
(R. 1799-1802).[3]
Volkswagen's argument centers primarily upon that portion of the court's instruction stating that "[t]he plaintiff in this case does not claim that [Volkswagen] caused the accident in question." (R. 1799.) Volkswagen argues that this language from the trial court's crashworthiness instruction relieved the plaintiffs from the burden of showing that the alleged defect — the vehicle's unreasonably low track width relative to the height of its center of gravity — was the cause of the accident and the resulting deaths of Susan Marinelli and Brian Madonia. This instruction, according to Volkswagen, also rendered *Page 383 
meaningless the substantial evidence presented by Volkswagen that the accident and resulting deaths were caused by factors wholly unrelated to the alleged instability of the Thing.[4] We cannot agree with Volkswagen's argument.
This Court adopted the so-called "crashworthiness doctrine" in General Motors Corp. v. Edwards, where two children died when the car in which they were riding was hit from behind by another car; the car in which the children were passengers burst into flames upon impact. The parents of the children brought AEMLD claims against General Motors Corporation, alleging that the gas tank, the fuel filler neck, and the doors were defectively designed. In Edwards, none of the alleged defects had anything to do with causing the other car to collide with the Edwardses' car. Rather, the allegation was that the deaths of the children proximately resulted from the defective condition of the vehicle, not that the defect caused or contributed to the collision.
In Edwards, this Court acknowledged that a cause of action has always existed under the AEMLD "where a defect in an automobile causes an accident which injures the ultimate consumer or one within the foreseeable scope of the automobile's use." 482 So.2d at 1181. (Emphasis added.) This Court also recognized that before Larsen v. General MotorsCorp., 391 F.2d 495 (8th Cir. 1968), "where there was no allegation that the defect in the automobile caused theaccident to happen, no cause of action arose against the vehicle's manufacturer." 482 So.2d at 1181. (Emphasis added.) In considering how a crashworthiness claim could arise against a manufacturer, this Court, in Edwards, distinguished a "crashworthiness" claim from those claims involving a defect that caused the injury-causing accident to occur, and described the "crashworthiness doctrine" as follows:
 "The 'crashworthiness doctrine,' which is also referred to as the 'second collision doctrine' or the 'enhanced injury doctrine,' is a recent development in the area of products liability law, so recent, in fact, that prior to 1968 a case of this nature would likely have been subject to dismissal for failure to state a claim upon which relief could be granted. While all jurisdictions which have adopted one of the various forms of liability applicable to manufacturers, such as our Alabama Extended Manufacturer's Liability Doctrine (A.E.M.L.D.), have always recognized that a cause of action exists where a defect in an automobile causes an accident which injures the ultimate consumer or one within the foreseeable scope of the automobile's use, until the landmark decision of Larsen v. General Motors Corp., 391 F.2d 495 (8th Cir. 1968), many jurisdictions, following the reasoning expressed in Evans v. General Motors Corp., 359 F.2d 822 (7th Cir.), cert. denied, 385 U.S. 836, 87 S.Ct. 83, 17 L.Ed.2d 70 (1966), overruled, Huff v. White Motor Corp., 609 F.2d 286
(7th Cir. 1979), held that, where there was no allegation that the defect in the automobile caused the accident to happen, no cause of action arose against the vehicle's manufacturer. Ropiequet, Current Issues Under the 'Second Collision' Doctrine, For the Defense, Oct. 1983, at 12-17."
Id. at 1181. In summarizing the difference between a "crashworthiness" claim and an AEMLD claim, the Court said:
 "To summarize, this Court follows Larsen in recognizing that a cause of action does exist against an automobile manufacturer where it is alleged that an automobile manufactured by it was defective, and was involved in an accident, and that the defect, although not causing the accident to occur, contributed to the injuries sustained therein. This Court also holds that such an action may be brought under the A.E.M.L.D."
Id. at 1191. This Court then set out the elements of the cause of action: *Page 384 
 "In order to recover against the automobile manufacturer in such cases, a plaintiff must prove the following:
 "I. That the plaintiff (or one upon whose behalf he brings suit) was involved in an automobile accident.
 "II. That an automobile involved in that accident was manufactured by the defendant manufacturer.
 "III. That, at the time of the accident, that automobile was substantially unchanged since leaving the manufacturer.
 "IV. That the automobile was defective. That is to say, that it did not meet the reasonable expectations of an ordinary consumer as to its safety because it was unreasonably dangerous, i.e., not fit for its intended purpose, which is to travel the streets, highways, and other thoroughfares. In order to prove defectiveness, the plaintiff must prove that a safer, practical, alternative design was available to the manufacturer at the time it manufactured the automobile. The existence of a safer, practical, alternative design must be proved by showing that:
 "(a) The plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design[;] and that[,]
 "(b) taking into consideration such factors as the intended use of the vehicle, its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighed the utility of the design actually used.
 "V. That the defect in the automobile proximately caused his injuries.
 "Plaintiff must offer at least a scintilla[5] of evidence tending to prove each of the elements in order to present a prima facie case; if he does, the defendant manufacturer may offer, in addition to evidence to counter plaintiff's prima facie case, the two affirmative defenses recognized as available to manufacturers under the A.E.M.L.D. — (1) assumption of risk, and (2) contributory negligence — and, of course, the defense that the proximate cause of the injury or death was the wrongful conduct of the striking driver or other intervening agency."
Id.
In the traditional AEMLD case, accident causation and injury causation are one and the same. See, e.g., Veal v.Teleflex, Inc., 586 So.2d 188, 190 (Ala. 1991) (plaintiffs contended that "if the steering cable [on the boat involved in the subject accident] had been functional, the accident would not have happened; therefore, they argue[d], its failure was the proximate cause of the accident"); Harley-Davidson, Inc. v.Toomey, 521 So.2d 971 (Ala. 1988) (plaintiff claimed that the defect in a motorcycle helmet caused the accident where plaintiff, while trying to clear his face shield, lost control of the motorcycle and collided with an oncoming automobile).
It is a basic tenet of Alabama law that "a party is entitled to have his theory of the case, made by the pleadings and issues, presented to the jury by proper instruction, . . . and the [trial] court's failure to give those instructions is reversible error." Alabama Farm BureauMut. Ins. Service, Inc. v. Jericho Plantation, Inc.,481 So.2d 343, 344 (Ala. 1985). (Citations omitted.) "It is the duty of the trial judge to educate the jury on the law of the case."Grayco Resources, Inc. v. Poole, 500 So.2d 1030, 1033 (Ala. 1986). As the Court in Grayco observed:
 "It is the inescapable duty of the trial judge to instruct the jurors fully and correctly on the applicable law of the case, and to guide, direct and assist them toward an intelligent understanding of the legal and factual issues involved in their search for the truth."
Id. (Citations omitted.)
Our standard for reviewing the trial court's instructions is plain. "In reviewing instructions to determine if they correctly set forth the applicable law, [this Court] must *Page 385 
read and consider the charge as a whole." Grayco, 500 So.2d at 1033. (Citations omitted.) The law is clear that the refusal of a requested charge is not error where the trial court's oral charge "substantially and fairly" covers the same principles as the requested charge. Rule 51, Ala.R.Civ.P.; Hamilton AutoParts, Inc. v. Rea, 580 So.2d 1328 (Ala. 1991). Rule 51 provides in pertinent part:
 "The refusal of a requested, written instruction, although a correct statement of the law, shall not be cause for reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the court's oral charge or in charges given at the request of the parties."
Applying the rule governing our review, we have carefully examined the entire oral instruction to the jury, and our examination demonstrates that the court repeatedly instructed the jury that under the AEMLD the plaintiffs bore the burden of proving that a defective and unreasonably dangerous condition in the automobile caused, or contributed to cause, the two deaths. Thus, we conclude that there is no reversible error in this regard. The record shows that the jury was instructed on the definition of "defect" and was given an extensive instruction on proximate cause, intervening cause, and the affirmative defenses raised by Volkswagen — misuse of the product and assumption of the risk.
As the plaintiffs point out, the Court in Edwards stated that an action based on the crashworthiness doctrine may be brought under the AEMLD. In Edwards, the Court held:
 "To summarize, this Court follows Larsen in recognizing that a cause of action does exist against an automobile manufacturer where it is alleged that an automobile manufactured by it was defective, and was involved in an accident, and that the defect, although not causing the accident to occur, contributed to the injuries sustained therein. This Court also holds that such an action may be brought under the A.E.M.L.D."
482 So.2d at 1191. (Emphasis added.) In Edwards, this Court held that in a case involving a crashworthiness claim the plaintiff's burden in proving causation is to present proof "[t]hat the defect in the automobile proximately caused his injuries." Id. Instruction 32.22, Alabama Pattern JuryInstructions: Civil, the crashworthiness charge, sets out the plaintiff's burden in proving causation, in identical language. Likewise, the plaintiff's burden in proving causation underA.P.J.I. Instruction 32.08, the AEMLD charge, is to present proof that the plaintiff was injured or damaged "as a proximate result of the defendant's placing on the market [an] unreasonably dangerous [product]." Consequently, the plaintiff's burden in establishing causation is identical whether the theory of liability is the AEMLD (that the defect proximately caused the injury) or the crashworthiness doctrine. Contrary to Volkswagen's position, neither doctrine requires proof of accident causation; rather, both doctrines focus on the alleged defect as being the proximate cause of the injury or damage.
Volkswagen's argument is based upon its claim that this case is not a crashworthiness case because the accident did not involve a "second collision." Such an argument has no basis in logic or fact, because Edwards, which Volkswagen argues presents a "classic" crashworthiness claim, technically did not involve a "second collision" either. In Edwards, the plaintiffs argued that a speeding driver caused an accident that would not have resulted in any deaths had the plaintiff's automobile been properly designed. Likewise, in this case, Nicholas Marinelli's reaction to an animal running out in front of him caused an "accident" (the vehicle's skidding sideways to its path of travel) that plaintiffs claim would not have resulted in any deaths had Nicholas' automobile been properly designed, that is, had it been designed, for example, with a lower center of gravity. Both cases focus on the capacity of the automobile to respond to a foreseeable hazardous situation without causing or enhancing injury. In Edwards, the occupants would not have died if the fuel system had not caught fire. Likewise, in this case, the plaintiffs presented evidence that the occupants would *Page 386 
not have died if the Volkswagen Thing had skidded to a stop instead of rolling over.[6]
After reviewing the instruction as a whole, we are convinced that "a fair and reasonable interpretation of the charge as a whole" left to the jury's determination the issue of whether the alleged defects in the vehicle were the proximate cause of the fatal rollover accident in this case.Alabama Power Co. v. Tatum, 293 Ala. 500, 504, 306 So.2d 251,254 (1975); Rule 45, Ala.R.App.P. We find no error here because the principles as to which Volkswagen requested a jury instruction were substantially covered in other portions of the trial court's oral instruction.
 II.
Volkswagen also argues that the trial court erred by failing to instruct the jury on "comparative fault" despite undisputed evidence that Volkswagen was not solely responsible for the accident and its resulting injuries. InWilliams v. Delta International Machinery Corp., 619 So.2d 1330
(Ala. 1993), this Court declined to adopt the doctrine of comparative negligence for this State. Thus, the trial court did not err in failing to give the requested instructions on comparative fault.
 III.
Volkswagen next contends that the admission of the expert testimony of Dr. Leon Robertson, one of the plaintiff's expert witnesses, constitutes reversible error. Dr. Robertson, a statistician from Yale University, testified about his statistical analysis of the risk of fatal rollover in regard to the Thing as compared to the risk in regard to other vehicles. According to Volkswagen, evidence of this analysis was improperly admitted because, Volkswagen says, it was based on hearsay and was unreliable in that the analysis did not involve vehicles that were substantially similar to the Thing or circumstances that were substantially similar to those of this accident.
One of the primary issues before the jury was whether an automobile manufacturer can predict the propensity of a vehicle to roll over, based upon the relationship between its track width and the height of its center of gravity. Dr. Robertson's testimony centered on the stability ratio of the Volkswagen Thing. This stability ratio, called the T/2H, was calculated by dividing the track width by twice the height of the center of gravity. The stability ratio of the Thing, as provided in Volkswagen's answers to interrogatories and response to requests for admissions, is 1.14 with four passengers and 1.17 with no passengers. It was Dr. Robertson's opinion that any vehicle with a stability ratio lower than 1.2 is unreasonably dangerous. Dr. Robertson also did some calculations to determine what would be needed to bring the Volkswagen Thing's stability ratio to 1.2.
Although Volkswagen criticizes Dr. Robertson's testimony as unreliable, the plaintiffs offered numerous scientific articles and government studies utilizing the same methodology or a similar one and the same data or data similar to those utilized by Dr. Robertson. In explaining these studies, Dr. Robertson testified that other scientists in his field had reached the same conclusion, that there is a correlation between a vehicle's stability ratio and its propensity to roll over. Volkswagen did not offer an expert to refute Dr. Robertson's data, methodology, or opinions. We conclude that the trial court did not err in allowing this testimony, because the evidence presented by the plaintiffs indicates that it was sufficiently reliable.
Volkswagen also argues that the trial court abused its discretion in allowing the testimony of Dr. Robertson, because it was based in part upon hearsay. Robertson based some of his testimony on information gathered from the Fatal Accident Reporting *Page 387 
System ("FARS"). Under the FARS system, established by the federal government in 1975, each state collects information from the police report, the coroner's report, and the Department of Motor Vehicles on each death associated with a moving vehicle where the death occurs within 30 days after the person is hit or ejected. This information is sent to Washington, D.C., where it is placed in a computer file so that anyone in the country can access it. Robertson testified that almost every similar study of automobile-related deaths has been based on FARS data and that the automotive industry publishes papers based on the FARS data. It was Robertson's opinion that the FARS information is reliable and authoritative and is the sort of information that experts use to conduct the type of study that he conducted.
In Brown Mech. Contractors, Inc. v. Centennial Ins. Co.,431 So.2d 932, 944, n. 6 (Ala. 1983), the Court noted that "[i]n general, only hearsay that is customarily relied on by experts and likely to be trustworthy is a proper basis for an expert opinion." For example, in Seaboard System R.R. v. Page,485 So.2d 326, 327-28 (Ala. 1986), the Court approved the admission of a National Institute for Occupational Safety and Health publication where the expert testified that it was authoritative in the field. Also, in Police Firemen's Ins.Ass'n v. Mullins, 260 Ala. 173, 179, 69 So.2d 261 (1953), the Court approved the admission of a public health bulletin reporting what various scientists had concluded on a particular subject, where the bulletin was identified by the witness as authoritative and as dealing with the particular science. See also, City of Dothan v. Hardy, 237 Ala. 603, 188 So. 264
(1939).
In E S Facilities, Inc. v. Precision Chipper Corp.,565 So.2d 54, 63 (Ala. 1990), the Court stated that "[e]xpert witnesses may, at the discretion of the trial judge, be allowed to testify based in part upon hearsay." The Court further explained that the trial court did not err in allowing the testimony of an expert witness based in part upon hearsay, because the testimony was also based upon his own examination and investigation. Id. The Court also noted that "any conceivable error" in allowing the testimony of the expert was corrected by the instruction given to the jurors that they were not required to accept the conclusions or opinions of the expert witnesses, but must determine for themselves the weight to be accorded such testimony when it was considered in connection with all material evidence. Id. A virtually identical charge was given to the jury in this case. (R. 1816-18.)
The trial court could have concluded that the accident information utilized by Dr. Robertson was the type of information customarily relied on by experts and likely to be trustworthy. The trial court's instructions to the jury properly reflected that Volkswagen's objections to the expert testimony went to the weight of the evidence and not to its admissibility. Thus, we hold that the trial court did not abuse its discretion in allowing it into evidence. See, Seese v.Volkswagenwerk A.G., 648 F.2d 833 (3d Cir. 1981) (similar objection to FARS data raised by Volkswagen; however, the trial court held that the any variables in the data went to the weight of the evidence and not to its admissibility).
 IV.
Volkswagen also argues that Alabama law requires a new trial because, it argues, the jury used the "quotient method" to reach its verdict for each plaintiff. According to Volkswagen, the jury's verdicts in this case did not reflect the fair judgment or the unanimous result of reasoned deliberation. Instead, it argues, the jury rendered compromise verdicts for each plaintiff through a method whereby each juror submitted a judgment amount and a verdict was reached based on the average of those amounts.
In this case, after the jury was excused, the trial court located a sheet of paper in the jury room on which each juror had submitted an amount that he or she thought would represent an appropriate verdict. The figures submitted by the jurors ranged from $0 to $2,000,000. On that sheet of paper, the sum of these amounts, $8,500,000, was divided by 12, the number of jurors, to arrive at an amount of $783,333, which was the amount of the verdict rendered in favor of each plaintiff.[7] *Page 388 
Thus, Volkswagen argues that the verdicts are due to be set aside. See, Security Mut. Finance Corp. v. Harris, 288 Ala. 369, 261 So.2d 43 (1972).
In support of Volkswagen's motion for a new trial, and in an attempt to impeach the verdicts of the jury, Volkswagen submitted the affidavits of jurors Paula Barnett, Leon Franklin, Sharon Holmes, Phillip McCarroll, Lena Russell, and Elizabeth Stipe. In response, the plaintiffs moved to strike those affidavits. The plaintiffs also submitted the affidavits of jurors Leon Franklin, Elizabeth Stipe, and Lena Russell, three of the jurors who had previously given affidavits to Volkswagen. In the affidavits those jurors gave to the plaintiffs, each juror stated that the jury averaged the suggested verdicts of the individual jurors; that the jury did not agree beforehand to be bound by that amount; that there were further discussions and suggested figures after the average of the suggested amounts had been calculated; and that their final verdict in favor of each plaintiff was unanimously reached by voting after the average had been calculated. The plaintiffs additionally filed the affidavits of jurors Syble Carr, Rachel Kirkland, Georgia Sanford, Maudetta Hamby, and Bennie Perrymon, wherein those jurors stated that there had been no prior agreement among the jurors that they would be bound by the result of the averaging process. By order dated June 8, 1992, the trial court struck the juror affidavits submitted by Volkswagen and denied Volkswagen's motion for a new trial.
It has long been the law in Alabama that while jurors are not permitted to impeach their own verdict, they may by affidavit disclose facts to sustain their verdict.Maring-Crawford Motor Co. v. Smith, 285 Ala. 477, 233 So.2d 484
(1970). In this case, Volkswagen submitted the affidavits of six jurors that tended to impeach the verdicts rendered by the jury; those affidavits were properly excluded by the trial court. The affidavits of the eight jurors submitted by the plaintiffs in support of the verdicts affirmatively showed that there was no prior agreement among the jurors to be bound by a quotient verdict. Because the juror affidavits submitted by the plaintiffs unquestionably established that the verdicts were not the result of a predetermined method of calculation, the trial court did not err in denying Volkswagen's motion for a new trial.
 V.
Finally, Volkswagen argues that the jury's verdicts must be vacated because, Volkswagen says, it was prejudiced by the failure of several of the jurors to respond during voir dire examination to questions regarding their involvement in previous litigation. Volkswagen argues that at least three jurors failed to respond to the following question, propounded by counsel for the plaintiffs, regarding whether they had been involved in previous litigation:
 "MR. PRATT: Let me ask a little bit different question. Have any of you been a party, that means either you were the person that brought the case or somebody in your immediate family. I'm talking about mom, dad, husband, wife, children. Either you or your family member brought a case; that's civil again, we're not talking about criminal and I'm not going to ask anybody about divorces, just civil and a claim for compensation where either you were the party that brought it or a case was brought against you or your family member."
Three persons who sat on the jury — Phillip McCarroll, Syble Carr, and Rachel Kirkland — did not disclose their involvement in prior litigation. Phillip McCarroll had been sued by State Farm Insurance Company regarding an automobile accident in which he was involved. Syble Carr had been a plaintiff in an action against Gulf Oil Company, alleging both contract and tort claims. Rachel Kirkland had been sued by Jefferson *Page 389 
State Junior College. According to Volkswagen, the question was an important one and these jurors' failure to answer it resulted in prejudice to Volkswagen; therefore, Volkswagen says, the jury's verdicts must be set aside and Volkswagen granted a new trial.
Although Volkswagen was given ample opportunity to follow up the questions asked by plaintiffs' counsel as to the potential jurors' involvement in civil litigation, counsel for Volkswagen failed to do so. When a party fails to use reasonable diligence in questioning potential jurors, that party waives any right to later challenge the jury on a motion for new trial. Aaron v. State, 273 Ala. 337,139 So.2d 309 (1961), cert. denied, 371 U.S. 846, 83 S.Ct. 81,9 L.Ed.2d 82 (1962).
While we are not persuaded that Volkswagen waived its right to complain in this case, we conclude that it is not entitled to a new trial, because we find no "probable prejudice" to Volkswagen. See Union Mortgage Co. v. Barlow, 595 So.2d 1335
(Ala. 1992). An examination of each juror's failure to respond demonstrates that the trial court did not abuse its discretion in denying Volkswagen's motion for a new trial on this issue.
Juror Syble Carr failed to reveal her involvement as a plaintiff in an action against Gulf Oil, filed in 1980 and removed to a federal court in 1981. That action concerned her husband's involvement in a commercial lease of a Gulf Oil station. There were no allegations in the complaint that Syble Carr was in any way involved in the lease or in her husband's dispute with Gulf. Furthermore, Volkswagen presented no proof that Syble Carr was even aware that her husband had filed the action or was aware that she was a party. Because the action did not involve any claim of personal injury, wrongful death, or products liability, there was no proof or even an inference that Mrs. Carr would have been predisposed toward the plaintiffs in this action.
Juror Rachel Kirkland failed to disclose that she had been a defendant in an action filed in 1980. The case action summary sheet from that action shows that a default judgment for $3,498.90 was entered against her in September 1980. There is no indication from the record that Mrs. Kirkland appeared in the action, nor was there any evidence before the trial court that Mrs. Kirkland even knew that the default judgment had been taken against her. Because Rachel Kirkland had been a defendant in the prior litigation, any possible prejudice she might have had likely would have been against the plaintiffs, not Volkswagen.
Juror Phillip McCarroll failed to reveal that he had been a defendant in a small claims action filed in August 1990 that arose out of an automobile accident. The certified record from that action shows that a default judgment for $1,297.44 was entered against Mr. McCarroll, but there is no indication that he ever appeared in court. Furthermore, there was no evidence before the trial court that Mr. McCarroll even knew about the small claims action, and, as with juror Kirkland, any prejudice he might have had likely would have been against the plaintiffs, not Volkswagen.
In Land Associates, Inc. v. Simmons, 562 So.2d 140, 149
(Ala. 1989), the Court, confronted with an almost identical issue concerning jurors' lack of response to voir dire questioning, noted that "[t]he trial court is in the best position to determine whether there was probable prejudice as a result of a juror's failure to respond to questions during voir dire." Under the facts of this case, we cannot say that the trial court abused its discretion in not granting a new trial for the failure of these three jurors to respond to the questions regarding prior litigation.
Based on the foregoing, the judgment of the trial court is due to be affirmed.
AFFIRMED.
ADAMS, HOUSTON, and INGRAM, JJ., concur.
ALMON, J., concurs in the result.
STEAGALL, J., concurs in part and dissents in part.
[1] The Volkswagen Model 181 "Thing" was developed for the German Army in 1968 as a courier wagon used for light-duty transportation. (R. 702, 714, 765, 1337, 1338.) Based on a design originally used during World War II, the Model 181 was adapted to the U.S. civilian market, and approximately 19,500 Volkswagen Things manufactured in Mexico were imported for sale in the United States from September 1972 through July 1974. The Thing featured a rear engine, rear wheel-drive format and weighed less than 2000 pounds.
[2] Although the reconstruction of this accident was disputed, the plaintiffs' expert, Michael Kaplan, testified that, after Nicholas Marinelli initially swerved to avoid the animal, the vehicle performed a 180-degree turn in the road (which Kaplan characterized as a "bootlegger's turn"), travelled backwards and partially off the left side of the road for approximately 40 to 50 feet, and ultimately rolled over as it reentered the road while still travelling backwards — all while the vehicle was in a forward gear and its parking brake was engaged. (R. 1033-43.)
* Reporter's note: This party's name is spelled several ways throughout the record.
[3] The above quoted charge essentially mirrors Instruction 32.22,Alabama Pattern Jury Instructions: Civil, on the crashworthiness doctrine.
[4] In its brief, Volkswagen states: "This instruction not only relieved the plaintiffs from the burden of showing that the alleged defect — the Thing's design instability — caused the accident, it rendered meaningless the substantial evidence presented by Volkswagen that the accident and resulting deaths were caused by factors wholly unrelated to the alleged defect — excessive speed, brake failure attributable to a lack of maintenance, jerking on the parking brake to stop a moving vehicle, and furrowing in the shoulder of the road."
[5] When it wrote Edwards, this Court applied the "scintilla rule of evidence." That rule was replaced in 1987 by the "substantial evidence rule." See § 12-21-12, Ala. Code 1975.
[6] The plaintiffs presented a strong case that the design of the vehicle caused the rollover in this case. The jury saw two "highway vehicle object simulation" ("HVOSM") computer simulations of the accident. The first, offered by Volkswagen's expert, Ray McHenry, replicated the accident based the dimensions of the Volkswagen Thing and on measurements taken from the accident scene. The second HVOSM simulation was offered through rebuttal testimony of Dr. Michael A. Kaplan, an expert testifying for the plaintiffs. This simulation showed that the rollover would not have occurred if the vehicle had had a stability ratio of 1.2; that ratio could have been obtained by lowering the center of gravity of the vehicle one inch.
[7] According to Volkswagen, the calculation was done incorrectly. The correct quotient figure should have been $708,333.33. The paper shows clearly, however, that the jury mistakenly calculated $783,333.33 to be the average of the proposed verdicts. The paper does not suggest in any way that the jury performed the correct calculation and subsequently adjusted the result from $708,333.33 to 783,333.00. Thus, Volkswagen says it was hit with a "double whammy" — an improper quotient verdict and an incorrect calculation, both to Volkswagen's detriment.