WINDOM, Presiding Judge.
Jeffery Tyrone Riggs appeals his capital-murder conviction and sentence of death. Riggs was convicted of murder made capital for taking the life of Norber Payne during the course of a burglary. See § 13A-5-40(a)(4), Ala.Code 1975. The jury, by a vote of 10-2, recommended that Riggs be sentenced to life in prison without the possibility of parole. After weighing the aggravating circumstances and the mitigating circumstances, the circuit court rejected the jury’s recommendation and sentenced Riggs to death. On July 26, 2010, Riggs filed a motion for new trial. Following a hearing, the circuit court denied Riggs’s motion.

Facts

Riggs and Norber Payne had been involved in a relationship for several years before her death. In 2005, Riggs bought a house and asked Payne and her daughters to move in with him. Approximately two years later, Payne and her daughters moved out of Riggs’s house and into an apartment in Center Point.[1] Payne was *1017 the only individual listed on the apartment lease. In 2007, Riggs moved into the apartment with Payne and her family.
According to Payne’s daughters, Natasha and Tiffany, their mother ended her relationship with Riggs after an argument in October 2007 between Payne, Riggs, and Tiffany.[2] Tiffany testified that she overheard an altercation between Riggs and Payne and walked into her mother’s bedroom to find Riggs choking Payne. Tiffany repeatedly hit Riggs until he let go of Payne, and he then grabbed Tiffany by the neck. Afterwards, Payne told Tiffany to call the police, but Riggs threatened to “shoot [them]” if she picked up the telephone. (R. 618.) Riggs further stated that they were “gonna die tonight.” (R. 618.) Later that night, Payne, Natasha, and Tiffany packed up Riggs’s personal belongings in a plastic bin and took them to his mother’s house. After this incident, Riggs no longer slept at the apartment. Natasha and Tiffany testified that during the three months preceding Payne’s murder, Riggs did not pay rent or utility bills, and did not live with them in the apartment.
Approximately a week before the murder, a break-in occurred at Payne’s apartment, during which the back door and its locking mechanism were damaged. When Payne returned to the apartment and saw the damage, she feared that someone was inside the apartment, and she telephoned Riggs for help. Riggs wedged a chair underneath the door knob as a temporary fix for the damaged lock.[3] (R. 452-54.)
On the evening of January 9, 2008, Payne was working at the Burger King fast-food restaurant in Roebuck, where she was a general manager. Around 10:00 p.m., Payne telephoned Natasha, who worked at another Burger King fast-food restaurant, and asked her to help close the store because they were short-staffed at the Roebuck store. Shortly after Natasha and her boyfriend, Kenny Williams, arrived at the Roebuck Burger King, Riggs pulled into the parking lot to drop off Payne’s granddaughter, Janiah, whom he often looked after while Payne and her daughters were working. Riggs remained at the restaurant until Payne was ready to leave. As Payne, Natasha, and Janiah were getting into their vehicle, Riggs asked Payne to step out of the car so they could talk. Payne and Riggs talked briefly before Payne got back into the vehicle with Natasha. On the ride home, Payne told Natasha that “she didn’t want [Riggs] back in her house.” (R. 437.)
Payne, Natasha, and Janiah arrived at their apartment around 1:30 a.m. on January 10, 2008. Tiffany was already at home and in bed. Natasha overheard Payne on the telephone with Riggs telling him that she was getting ready for bed. Natasha was in her room when she heard Payne calling for her from her bedroom. Several moments later, Tiffany heard a “loud boom” (R. 653) that sounded like the door being kicked open. Shortly thereafter, *1018 Natasha saw “[Riggs] running down the hall with a gun in his hand.” (R. 464.) Natasha then saw Riggs go into her mother’s bedroom, and she heard approximately four gunshots.[4] Moments later, Natasha saw Riggs run back down the hall and out the back door.
At 2:18 a.m., Natasha dialed emergency 911 and reported that her mother had been shot. At 2:24 a.m., Riggs telephoned the sheriffs office from his mother’s house and stated that he wanted to turn himself in to law enforcement. Sergeant Clyde Money, along with three other deputies, drove to Riggs’s mother’s house where Riggs was taken into custody and read his Miranda[5] rights. Sergeant Money asked Riggs about his gun, and Riggs described his gun and the location where he placed it. Riggs’s parents gave Sergeant Money consent to search their house for the weapon and indicated that Riggs lived there in the house with them. (R. 738-39.) Based on Riggs’s statement, the gun was recovered and taken into evidence. Afterwards, Riggs was taken to a sheriffs office for questioning.
At the sheriffs office, Riggs was again read his Miranda rights, and he signed a waiver-of-rights form. Riggs then gave Sergeant Mike House his oral statement which was recorded and a written statement, in which he admitted to following Payne back to the apartment, to kicking the back door open after Payne slammed it in his face, to following Payne into her bedroom, and to shooting her with his gun. (R. 857.) The physical evidence collected from Riggs and the crime scene revealed that the tread pattern of a shoe print taken from Payne’s back door matched the tread print of the shoe Riggs was wearing at the time he was taken into custody. Additionally, the blood found on Riggs’s clothing was tested and found to be Payne’s. (R. 863.) Evidence technicians collected four spent shell casings and two live rounds in Payne’s bedroom. It was also determined that Riggs’s gun contained one live round.
During the course of the investigation, Terrance Battle provided investigators with his cellular telephone and several digital voice-mail recordings left by Riggs. According to Battle, he began working with Payne in August 2006. Within a few weeks, Battle learned that Payne was no longer living with her boyfriend and had moved to Center Point. The two began a romantic relationship in October 2007. In December 2007, Battle received a telephone call between 5:00 and 6:30 a.m. from a male, who called himself “Jeff.” The caller asked whether Battle had seen Payne. Battle replied that he had not and the caller hung up. Approximately one month later, in January 2008, Battle received another telephone call from the same number, during which the caller threatened that if “[Payne] came back to Battle’s house, something would happen to her.” (R. 814-15.) In addition to the telephone calls, Battle received two voice mails on January 5, 2008, and a third voice mail on January 7, 2008. After receiving the second voice mail, Battle telephoned Payne to tell her that “Jeff’ had left a threatening message, to which she responded that “he[ was] following [her]” and that “[she would] call [Battle] back later.” (R. 819.) Approximately one week later, Battle received a call from Riggs, during which Riggs asked about Battle’s *1019 relationship with Payne. Battle testified that he “blew [Riggs] off’ and had not spoken to him or returned any messages since that day. (R. 821.)
The autopsy revealed that Payne died as a result of a gunshot wound to her chest. The autopsy further revealed that there were four entrance and four exit wounds, consistent with the four spent shell casings found in her bedroom. (R. 1131-82.) Several of the gunshot wounds had signs of stippling, indicating that Payne was shot at close range or with a particularly powerful gun. Additionally, the exit wound on Payne’s back was classified as a “short exit wound” (R. 1141), leading the medical examiner to conclude that Payne was most likely lying in bed or falling into bed when she was shot.
After the State rested, Riggs testified in his own defense. Riggs stated that he bought a house in 2005 and that he asked Payne and her daughters to move into the house with him. Riggs admitted that their relationship was not perfect and that over the years he and Payne had had several arguments during which they threatened to throw one another out of the house. (R. 1289-90.) Riggs also admitted to leaving threatening voice-mail messages on Battle’s cell phone but stated that he intended only to scare Battle.
Riggs testified that he encountered financial problems in 2007 and his house went into foreclosure. According to Riggs, Payne leased an apartment in her name after Riggs’s application was denied because of the ongoing foreclosure proceedings. Riggs testified that he moved into the apartment with Payne and that he had helped purchase furniture for the apartment. Riggs stated that he lived in the apartment, paid a portion of the rent and utilities, kept his personal belongings there, and had his own key to the apartment until Payne’s death on January 10, 2008. (R. 1231-32, 1251, 1272-73, 1308.) Additionally, the defense presented several witnesses who testified that Riggs was still living in the apartment with Payne on the morning that Payne was shot and killed.[6]
Riggs testified that on the evening of Payne’s death, he brought Janiah to Burger King fast-food restaurant and waited as Natasha and Payne finished cleaning the store. Riggs left Burger King and drove to his mother’s house. Riggs telephoned Payne and told her that he wanted to work things out and that they needed to talk. Riggs was still on the telephone with Payne when he arrived at the apartment. Riggs told Payne that he was at the back door. Payne, dressed in nothing but her underwear, cracked the door so they could talk. Riggs began questioning her about the status of their relationship. However, when Riggs attempted to ask Payne about her relationship with Battle, Payne slammed the door in his face, striking Riggs in the eye and causing him to fall back and hit his head. (R. 1372-73.)
After Payne struck him with the door, Riggs kicked the door with his left foot, forcing it open and knocking over a chair. Payne stormed off down the hallway toward the bedroom and Riggs followed her. (R. 1374.) The argument continued into the bedroom, where the two began “hollering” and “screaming” at one another. (R. 1390.) Riggs later testified that the room was dark, except for the glare from the television, which was on. (R. 1389.) At some point during the argument, Payne put her knee up on the bed and retrieved an object. When Payne turned around, *1020 Riggs “[saw] a handle” and “something shining” (R. 1388-89), which he said he believed was a knife.[7] Riggs asked Payne to put the object down, but she did not. Payne then climbed off the bed and approached Riggs. According to Riggs, he believed that Payne was about to stab him; therefore, he reached for the gun he had in his pants and began shooting. Riggs could not recall how many times he shot, but stated that he stopped firing when he saw Payne lying on her side. (R. 1393.)

Standard of Review

Because Riggs has been sentenced to death, according to Rule 45A, Ala. R.App. P., this Court must search the record for “plain error.” Rule 45A states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
(Emphasis added.)
In Ex parte Brown, 11 So.3d 933 (Ala.2008), the Alabama Supreme Court explained:
“ ‘ “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” ’ Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
“ ‘The Rule authorizes the Courts of Appeals to correct only “particularly egregious errors,” United States v. Frady, 456 U.S. 152, 163 (1982), those errors that “seriously affect the fairness, integrity or public reputation of judicial proceedings,” United States v. Atkinson, 297 U.S. [157], at 160 [(1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” United States v. Frady, 456 U.S., at 163, n. 14.’
“See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the error would ‘seriously affect the fairness or integrity of the judicial proceedings,’ and that the plain-error doctrine is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result’ (internal quotation marks omitted)).”
11 So.3d at 938. “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.” Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999). While Riggs’s failure to object will not bar this Court from reviewing any issue, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991).

Discussion

I.
On appeal, Riggs argues that the circuit court committed reversible error by failing to accurately charge the jury on *1021 provoked heat of passion as it applied to his capital-murder charge. Specifically, he contends that circuit court’s instruction on capital murder failed to include the critical negative element, which requires the State to prove beyond a reasonable doubt “‘[t]hat the defendant was not lawfully provoked to do the act which caused the death of the deceased by a sudden heat of passion.”’ Ex parte McGriff, 908 So.2d 1024, 1033 (Ala.2004) (quoting Alabama Pattern Jury Instructions — Criminal, pp. 6-8 (3d ed.1994) (emphasis omitted)). Riggs failed to request and failed to object to the circuit court’s failure such an instruction; therefore, this issue will be reviewed for plain error only. Rule 45A, Ala. R.App. P.
At trial, the circuit court gave the following instructions regarding Riggs’s capital-murder charge:
“Now, ladies and gentlemen, this Defendant is charged with the offense of Capital Murder. As I mentioned before, the indictment alleges that Jeffery Tyrone Riggs, did intentionally cause the death of Norber Payne, by shooting her with a pistol. And Jeffery Tyrone Riggs caused said death during the time that he knowingly and unlawfully entered or remained or attempted to unlawfully enter or to remain unlawfully in the dwelling of Norber Payne with the intent to commit the crime of murder, therein.
“And while effecting entry, Jeffrey Tyrone Riggs was armed with a deadly weapon or dangerous instrument to wit a pistol in violation of Section 13A-5-40(a)(4)[, Ala.Code 1975],
[[Image here]]
“Of course, the Defendant is charged with Capital Murder. And the law states that an intentional murder [committed] during a burglary in the first-degree is Capital Murder.
“So you have two components. You have an intentional murder. And you have a burglary in the first-degree.
“The law says that a person commits the crime of murder if he intentionally causes the death of another person. And in performing the acts which caused that death, he intends to kill that person. I’ll say that again.
“The law says that a person commits an intentional murder, if he causes the death of another person and in performing the act or acts which caused the death of that person[, he] intends to kill that other person.
“A person commits a burglary in the first-degree if he knowingly, and unlawfully enters or remains unlawfully in a dwelling and he does so with the intent to commit a crime therein. And while effecting entry, or while in the dwelling, or in the immediate flight therefrom, he causes physical injury to another person.
“So — and this is what you need to make note of because the State must prove each one of these following] elements beyond a reasonable doubt.
“First, in order to convict the Defendant of Capital Murder, the State must prove beyond a reasonable doubt the following elements:
“First, that Norber Payne is dead.
“Secondly, that the Defendant. Caused her death. By shooting her. With a pistol.
“That the Defendant caused her death by shooting her with a pistol.
“Thirdly, that in committing the acts which caused her death, the Defendant intended to kill her. That’s a fancy way of saying that when he shot her, he must have intended to kill her.
“The law says that a person acts intentionally, when it is his purpose to *1022 .cause that result. Or his purpose to engage in that conduct.
“The intent to kill, in this charge, must be real and specific.
“In other words, you must find that the Defendant specifically intended to kill Norber Payne. Do you all follow me?
“(No verbal response.)
“THE COURT: Okay.
“That’s the third element.
“Specific intent.
“To kill Ms. Payne.
“Fourthly, the forth element is that the Defendant must have either knowingly entered. Or remained unlawfully. In the dwelling of Ms. Payne.
“(Pause.)
“THE COURT: Fifth, that in doing so, the Defendant acted with the intent to commit a crime, namely murder.
“(Pause.)
“THE COURT: So the State must convince you that when he either knowingly entered that dwelling, or when he remained unlawfully in that dwelling. That he did so, acting with the intent to commit the crime of murder.
“(Pause.)
“THE COURT: Sixth, that while the Defendant was in the dwelling. The Defendant caused physical injury to Norber Payne.
“That while he was in the dwelling, or in effecting entry thereto, or in the immediate flight therefrom, the Defendant caused physical injury to Norber Payne.
“And lastly, number seven. The seventh element is that the murder took place during a burglary.
“As I’ve previously defined that concept to you.
“That the murder took place during the burglary.
[[Image here]]
“So if you find from the evidence that the State has proved beyond a reasonable doubt each one of these seven elements. You shall convict the Defendant of Capital Murder.
“If you find that the State has not proved any one of those seven elements, then you shall acquit the Defendant of Capital Murder.
“Okay. That’s clear?
“(No verbal response.)
“THE COURT: Good.”
(R. 1650-57.) After instructing on capital murder and intentional murder, the circuit court went on to instruct the jury that “if [it did] not reach a unanimous verdict on Capital Murder or murder, then [it would] consider the next lesser included offense of manslaughter, of the provocation sort.” (R. 1659.) Although the circuit court instructed the jury on provocation manslaughter, it did not instruct the jury that to find Riggs guilty of capital murder, it must first find that the State proved beyond a reasonable doubt the absence of heat of passion. In other words, the circuit court did not instruct the jury that as an element of capital murder the State must disprove that Riggs was lawfully provoked and thus caused Payne’s death in the heat of passion.
In their briefs on appeal, both parties agree that “ ‘[t]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide ease[,]’ ” Ex parte McGriff, 908 So.2d at 1033 (quoting Mullaney v. Wilbur, 421 U.S. 684, 704, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)); however, they strongly disagree on whether an instruction regarding the State’s burden was warranted in this case. Specifically, the State argues that *1023 Riggs was not entitled to a heat-of-passion instruction because he failed to present any evidence of legal provocation; therefore, he could not have been prejudiced by the circuit court’s incomplete instruction. (State’s brief, at 36, 40.) Riggs, on the other hand, contends that not only was he entitled to such an instruction, but also by omitting the critical element from its capital-murder instruction, the circuit court undermined his defense strategy “to persuade the jury that provoked heat of passion mitigated the killing to manslaughter.” Ex parte McGriff, 908 So.2d at 1032; see also Riggs’s brief, at 41-42 (R. 1481-83.)
“ ‘ “[T]he Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged.”’” Ex parte McGriff, 908 So.2d at 1035 (quoting McMillan v. Pennsylvania, 477 U.S. 79, 85, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), quoting in turn Patterson v. New York, 432 U.S. 197, 210, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), emphasis omitted). Consequently, “‘it is the mandatory duty of a trial judge to instruct the jury orally on the different and distinguishing elements of the offense charged and that in the absence of such instructions from the court, the jury could not intelligently comply with their duty as jurors. Miller v. State, Ala. Cr.App., 405 So.2d 41, 48 (1981).’ ” Ex parte McGriff, 908 So.2d at 1035 (quoting Ainsworth v. State, 465 So.2d 467, 471 (Ala.Crim.App.1984)). Further, “ ‘[i]t is a basic tenet of Alabama law that “a party is entitled to have his theory of the case, made by the pleadings and issues, presented to the jury by proper instruction, ... and the [trial] court’s failure to give those instructions is reversible error.” ’ ” Winner Int’l Corp. v. Common Sense, Inc., 863 So.2d 1088, 1091 (Ala.2003)
(quoting Volkswagen of America, Inc. v. Marinelli, 628 So.2d 378, 384-85 (Ala.1993), quoting in turn Alabama Farm Bureau Mut. Ins. Serv., Inc. v. Jericho Plantation, Inc., 481 So.2d 343, 344 (Ala.1985)).
Under the law in this State:
“A person does not commit murder ... [and by extension capital murder] if he was moved to act by a sudden heat of passion caused by a provocation recognized by law, and before there had been a reasonable time for the passion to cool and for reason to reassert itself. The burden of injecting the issue of killing under legal provocation is on the defendant, but this does not shift the burden of proof. This subsection does not apply to. a prosecution for, or preclude a conviction of, manslaughter or other crime.”
Section 13A-6-2(b), Ala.Code 1975. In Ex parte McGriff, 908 So.2d at 1033-34, the Alabama Supreme Court explained that once a defendant on trial for capital murder has “injected the issue of provoked heat of passion,” the circuit court must instruct the jury that “‘[t]o convict, the state must prove beyond a reasonable doubt [that] the defendant was not lawfully provoked to do the act which caused the death of the deceased by a sudden heat of passion.’ ” (quoting Alabama Pattern Jury Instructions-Criminal, pp. 6-8, emphasis omitted).
Further, it is well settled that “ ‘[a] killing in sudden passion excited by sufficient provocation, without malice, is manslaughter.’” Roberson v. State, 217 Ala. 696, 699, 117 So. 412, 415 (1928) (quoting Vaughan v. State, 201 Ala. 472, 474, 78 So. 378, 380 (1918)). Specifically, § 13A-6-3(a)(2), Ala.Code 1975, provides that a person commits the crime of manslaughter if
“[h]e causes the death of another person under circumstances that would constitute [intentional murder]; except, that *1024 he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to assert itself.”
Although courts have reached different conclusions as to what constitutes adequate legal provocation, in Rogers v. State, 819 So.2d 643, 662 (Ala.Crim.App.2001), this Court recognized the following three situations in which murder may be reduced to manslaughter on the basis that there existed legal provocation: “(1) when the accused witnesses his or her spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on himself; and (8) when the accused witnesses an assault on a family member or close relative.” See also Cox v. State, 500 So.2d 1296, 1298 (Ala.Crim.App.1986) (holding that “the mere appearance of imminent assault may be sufficient to arouse heat of passion”). Thus, once a defendant has injected into the trial the issue of provocation related to one or more of those three situations, the defendant is entitled to have the circuit court instruct the jury that the State bears the burden of disproving that the defendant acted out of the heat of passion brought about by adequate provocation. McGriff, 908 So.2d at 1033-34.
Here, Riggs was charged with the capital offense of murder during the course of a burglary, in violation of § 13A-5-40(a)(4), Ala.Code 1975, but claimed that he was either acting in self-defense at the time of the shooting or guilty of the lesser-included offense of provocation manslaughter. See (R. 1452-53.) At trial, Riggs did not deny that he shot and killed Payne; instead, he “injected the issue of provoked heat of passion,” Ex parte McGriff, 908 So.2d at 1033, by claiming that he shot Payne only after she hit him in the eye with a door and came after him with what he believed to be a knife. Specifically, Riggs presented evidence indicating that Payne met him at the back door to talk. During the conversation, Payne became angry after Riggs asked about her relationship with Battle and slammed the door in Riggs’s face, striking him in the eye and causing him to hit his head. Riggs further stated that after he followed Payne into her bedroom, she picked up what he believed to be a knife and appeared to be getting ready to attack him. Riggs stated that he feared for his safety, and, therefore, reached for the gun he was carrying in his pants and began firing. (R. 1396, 1409.)
By this evidence, Riggs adequately “injected the issue of provoked heat of passion.” Ex parte McGriff, 908 So.2d at 1033. See Shultz v. State, 480 So.2d 73, 76 (Ala.Crim.App.1985) (“[T]he fact that the victim was about to cut the appellant before he shot the victim could constitute legal provocation”) (citing Roberson, 217 Ala. 696, 117 So. 412). Therefore, Riggs was entitled to a proper instruction during the capital-murder charge regarding the State’s burden to disprove that he acted by provoked heat of passion. Accordingly, “the failure of the [circuit] court to charge the jury accurately on provoked heat of passion as it applied to the capital murder charge constitutes plain error.” McGriff, 908 So.2d at 1036-37. Cf. Shultz, 480 So.2d at 76 (“[Section] 13A-6-3(a)(2)[, Ala. Code 1975,] is designed to cover those situations where the jury does not believe a defendant is guilty of murder but also does not believe the killing was totally justified by self-defense.”); Wyllie v. State, 445 So.2d 958 (Ala.Crim.App.1983) (holding that the circuit court erred in failing to give a provocation-manslaughter instruction in a case where the defendant shot her husband after he threatened to cut her throat with a knife and then came at her *1025 with his hands in his pocket); Hill v. State, 485 So.2d 808 (Ala.Crim.App.1986) (holding that the defendant was entitled to a manslaughter instruction based on the fact that his wife attacked him with a knife and threatened to kill him). Because it was plain error for the circuit court not to accurately charge the jury on provoked heat of passion as it applied to Riggs’s capital-murder charge, this Court reverses Riggs’s conviction and sentence of death and remands this cause for further proceedings.
II.
Although this Court reverses Riggs’s conviction for the reasons stated in Part I of this opinion, it is compelled to address another issue Riggs raises on appeal because it may arise on retrial.
Riggs argues that the circuit court failed to properly instruct the jury regarding the law of burglary, a critical element of his capital-murder charge. Specifically, Riggs contends that the circuit court erroneously “failed to inform jurors that if they determined that [he] occupied or possessed the apartment at the time the offense was committed, no burglary was committed.” (Riggs’s brief, at 17.) Riggs neither requested nor objected to the circuit court’s failure to instruct the jury that a person cannot burglarize a place the person owns or occupies; therefore, this issue is reviewed for plain error only. Rule 45A, Ala. R.App. P.
Riggs was charged with the offense of murder made capital because it was committed during the course of a burglary. See § lSA-5-40(a)(4), Ala.Code 1975. At trial, the State presented evidence indicating that Riggs had not lived in the apartment with Payne and her family since the fall of 2007, when Payne ended her relationship with Riggs and returned his belongings. Riggs, however, presented evidence to the contrary. Specifically, he presented testimony indicating that he was still living with Payne in the apartment at the time of her death. Riggs further testified that he helped Payne purchase furniture for the apartment, assisted with the rent and other utilities, kept his personal belongings at the apartment, and had his own key. (R. 1231-32, 1250-51, 1272-73, 1308.) Riggs’s mother, aunt, and son also testified that he was living with Payne in the apartment at the time the offense was committed. (R. 1231, 1250-51, 1273.) Based on this evidence, Riggs argued that he was a legal occupant of the apartment at the time of Payne’s death and, thus, could not have committed the capital offense of burglary-murder as charged in the indictment.
At the close of all the evidence, the circuit court instructed the jury regarding the State’s theory that Riggs was licensed to be at Payne’s apartment but that the license may have been revoked. See Davis v. State, 737 So.2d 480, 486 (Ala.1999). Specifically, the circuit court stated:
“THE COURT: A person’s license or privilege to enter or remain in a dwelling, may be revoked at any time by the lawful possessor of the property. If the person remains after the privilege has been revoked, that person remains unlawfully.
“Breaking is not an essential element of burglary. Only an entry must be proved.
“The unlawful remaining prong of Alabama’s burglary statute covered cases where a person enters with license or privilege, but remains after termination of such license or privilege.”
(R. 1665.) The circuit court did not, however, instruct the jury on Riggs’s theory of defense, i.e., that if the jury found that *1026 Riggs was living in the apartment at the time of the offense, he could not be found guilty of burglary and, thus, could not be convicted of capital murder on the basis that the murder was committed during a burglary.
This Court has explained:
“In Alabama, ‘[b]urglary, like trespass, is an offense against the possession, and hence the test for the purpose of determining in whom the ownership of the premises should be laid in an indictment is not the title, but the occupancy or possession at the time the offense was committed.’ Hamilton v. State, 283 Ala. 540, 545, 219 So.2d 369, 374, cert. denied, 396 U.S. 868, 90 S.Ct. 134, 24 L.Ed.2d 121 (1969) (quoting Fuller v. State, 28 Ala.App. 28, 30, 177 So. 353, 354 (1937)). ‘A person “enters or remains unlawfully” in or upon premises when he is not licensed, invited or privileged to do so.’ Ala.Code 1975, § 13A-7-l(4). Under Alabama law, a person who is licensed or privileged to enter premises cannot commit criminal trespass or burglary. Johnson v. State, 473 So.2d 607, 609 (Ala.Cr.App.1985).”
White v. State, 587 So.2d 1218, 1223 (Ala.Crim.App.1990). Therefore, “[e]harging ownership in a burglary count puts the onus on the State of showing ‘ownership,’ i.e., occupancy — rather than title. The person in possession (either himself or by servant) is the occupant for this purpose.” White v. State, 42 Ala.App. 249, 254, 160 So.2d 496, 500 (1964) (internal citations omitted). Because “the offense [of burglary] is not committed by one who breaks and enters his own dwelling or other building,” Stanley v. State, 57 Ala.App. 83, 84, 326 So.2d 148, 149 (Ala.Crim.App.1976), the Alabama Supreme Court has held that “[a]n essential averment in a charge for an offense against property is the negation of the defendant’s ownership or possessory right, so as to affirmatively show that the property, general or special, against which the crime is laid, is in another.” Wilson v. State, 247 Ala. 84, 85, 22 So.2d 601, 602 (1945) (citing Edmonds v. State, 87 Ala. 12, 6 So. 54 (1889)).
At trial, Riggs presented evidence that he was living in the apartment with Payne at the time of the murder. Based on this evidence, Riggs was entitled to a jury instruction that if the jury found that Riggs was living in the apartment with Payne at the time of the murder, it could not find that he had committed a burglary and, thus, could not find him guilty of capital murder. Because this Court is reversing Riggs’s conviction and sentence of death on Issue I, it need not decide whether plain error resulted from the circuit court’s failure to give this unrequested instruction.
Accordingly, for the reasons stated in Part I of this opinion, Riggs’s conviction and sentence of death are reversed, and this cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
WELCH, KELLUM, BURKE, and JOINER, JJ., concur.

. There is conflicting evidence regarding the exact date and reason Payne and her daughters moved out of Riggs’s house; for instance, Payne's daughter Natasha testified that they *1017 moved out and into their own apartment because some of her mother’s jewelry was missing. (R. 484-85.)

. Natasha testified that she had a good relationship with Riggs but that he and Tiffany had never gotten along. (R. 477, 479.)

. There was conflicting evidence regarding the condition of the doorknob as a result of the burglary. Specifically, Natasha testified that the deadbolt was broken but that the doorknob was still attached, while Riggs testified that the door frame was damaged and that the doorknob was completely broken off and lying on the floor when he arrived. (R. 452-54, 1354.) Riggs further testified that he placed a nail in the bottom of the door to hold it closed. (R. 1359.)

. Natasha testified that she believed she heard four gunshots followed by a “little noise.” (R. 517.) She further stated that it sounded like "[Riggs was] still trying to shoot, but there [were] no bullets coming out.” (R. 517.)

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Riggs's mother, Patricia, and his son, Jeffery Riggs, Jr., and his aunt, Sharon Hill, all testified that Riggs lived in the apartment with Payne from the time he lost his home until the night Payne was killed. (R. 1231, 1250-51, 1273.)

. Riggs later acknowledged that the object was actually a fork. (R. 1408-09.)